[Civ. No. 14110.   Second Dist., Div. One.   May 9, 1944.]

JOHN J. DOYLE et al., Respondents, v. CHIEF OIL COMPANY (a Corporation) et al., Appellants.

C. Roy Smith for Appellants.

Cameron & Perkins for Respondents.

YORK, P. J.—Defendants appeal from a judgment rendered in favor of plaintiffs for the sum of $3,315.66 and interest, as actual damages, and the further sum of $500, as exemplary damages, in an action for fraud arising out of an oil and gas lease.

The respondents Doyle, as owners and lessors, on March 26, 1934, entered into an oil and gas lease with one C. G. Truitt, as lessee, covering certain premises situate in the city of Signal Hill, under the provisions of which lessors were

to receive as royalty 12½ per cent of all oil and gas produced from such premises. On November 2, 1934, said Truitt and his wife, as lessors, executed a sublease to appellant Chief Oil Company, which reserved to the lessors "as royalty the equal one-sixth part of the value of all oil removed from the leased premises" after making customary deductions, and also provided that "24. All payments which may fall due under this lease shall be made 12½% to J. J. Doyle and 4.6% to C. G. Truitt, one of the above named lessors, in the manner herein stated."

Thereafter, appellants drilled an oil well upon said land and placed the same on production on or about January 13, 1935. Said well which was commonly known as Chief Well No. 2, Doyle Lease, continued on production until sometime during the month of September, 1935, producing large quantities of oil and gas. Appellants accounted to respondents from month to month for the latter's one-eighth landowners' royalty, based on a total production of 28,536.64 barrels of oil, or, as alleged in the complaint, "deposited monthly what the defendants represented was the plaintiffs' royalty of 12½% of the proceeds thereof . . . to the account of the plaintiff, John J. Doyle, in the Security First National Bank of Los Angeles . . . accompanied with written statements purporting to show the amount of all the oil and gas sold by defendants and all the sums of money realized therefrom."

Respondents instituted the instant action sounding in fraud, alleging that the statements and representations so made by appellants as to the total number of barrels of oil produced from said premises were false and fraudulent, were known by appellants to be false and fraudulent and were made and caused to be made by appellants with the purpose and intent of cheating and defrauding respondents out of their royalty on 18,450 barrels of oil, which was the difference between the production accounted for and the amount actually produced by the said well during the period in question.

Respondents also alleged that while said well was on production and at the time the complaint herein was filed, they were residents of the State of North Dakota, had no means of knowing that appellants were falsifying their statements as to production and remained unaware and did not discover the falsity of such statements of appellants until August, 1940.

The court found that the total production was 50,842.60 barrels; that appellants had accounted to respondents for a total production of 28,536.64 barrels, and that appellants had failed to account to respondents for a total of 22,305.96 barrels of oil, and gave judgment accordingly, as hereinbefore indicated.

Appellants make the following specific assignments of error on the part of the trial court:

1. The admission in evidence of certain documents which were hearsay only and utterly incompetent as evidence;

2. That certain findings of fact are not supported by the evidence;

3. That it was error to render a judgment against the individual appellants who were not parties to the contract or liable thereunder;

4. That exemplary damages are not allowable in an action for accounting based upon an express contract;

5. That the judgment for exemplary damages in the sum of $500 is not sustained by the findings of fact.

The oil well here in question was not connected with any pipe line, consequently, when the oil was sold it was necessary to haul it in tank trucks. To facilitate delivery of the oil to the trucks, two large tanks 25 feet in height, each having a capacity of several hundred barrels, referred to as Tank No. 1 and Tank No. 2, were maintained at the site of the well and were filled in rotation with oil therefrom. Appellants employed as their pumper one Albert A. Dickinson, who had charge of the production of oil at the well. Among others, it was his duty to gauge or measure the oil in the tanks and prepare it for shipment. In order to keep a record of the production of the well and the amount of oil sold therefrom, appellants followed the customary practice of the oil industry, and furnished Dickinson with books known as pumper's daily gauge reports made especially for that purpose, in which said Dickinson was required to mark down the number of the tank being gauged and the different gauge readings each time the tank was measured. The owners of the well and those in charge of its operation are furnished with a chart, or "strappings" so-called, to be used in measuring the oil in the tanks. This chart shows how much oil is in the tank at all various depths measured in feet and inches. As an illustration of this method of measuring oil

in the tank: when a purchaser wished to buy oil, the pumper in charge of the well would take a steel tape with a plumb bob at the end and drop it into the tank until the plumb bob touched the bottom of the tank. The steel tape would be withdrawn from the oil and the gauger would note the depth of the oil in the tank as shown by the mark on the steel tape. The gauger would then turn to the chart or "strappings" which showed the gauger, without any computation on his part, the exact number of barrels of oil in the tank at the particular depth.

Whenever oil was sold from the well here involved, the pumper Dickinson and the agent of the purchaser would take the high gauge of the tank from which the oil was being delivered, and the low gauge thereof after the oil was withdrawn. By referring to the chart the amount of oil that had been removed from the tank was ascertained. High, low and intermediate gauges were shown on the pumper's daily gauge reports. Much of the oil produced by the well in question was purchased by the Los Angeles Refining Company which had in its employ a gauger by the name of Smith, who took the high and low gauges of the tank which was being shipped, and reported the figures to his company, together with a notation of the location of the well from which the oil was taken. Thereupon the refinery would issue crude oil invoices (also referred to as receipts or run tickets), stating the amount of oil thus received. Operators Oil and Refining Company of Long Beach was also a frequent purchaser of oil from the well and also issued "run tickets" for the oil shipped to it.

Beginning with the month of March, 1935, Dickinson kept in a blue book, plaintiffs' exhibit 4, a record of oil sold and shipped from the well, together with the names of the purchasers to whom shipped and sold. In 1940, respondent Doyle came to California and visited Dickinson at Taft, where he was then employed, and procured from him the pumper's daily gauge reports, plaintiffs' exhibits 2 and 3; and the blue book, plaintiffs' exhibit 4, showing the shipments and sales of oil made from this well, as recorded by said Dickinson. By comparing these exhibits with the monthly statements rendered by appellants to respondent Doyle while the well was on production, the discrepancies which form the basis of the instant litigation were discovered.

The documents as to the admission of which appellants particularly object include (a) two pumper's daily

gauge reports (plaintiffs' exhibits 2 and 3); (b) the blue book (plaintiffs' exhibit 4); (c) several bundles of crude oil invoices or run tickets (plaintiffs' exhibit 6), taken from the files of Operators Oil and Refining Company; and (d) several bundles of crude oil invoices (plaintiffs' exhibit 7), which were taken from the files of the Los Angeles Refining Company. These two companies, as heretofore stated, purchased the major portion of the oil produced by Chief Well No. 2, Doyle Lease, during the period referred to.

Referring to the two pumper's daily gauge reports, exhibits 2 and 3, it should be noted that these were books of appellant corporation and were kept in the usual course of business. Appellant Schultz gave the blank books to the witness Dickinson and told him to use them in keeping track of the production of the well. The books were kept under the supervision of the witness Dickinson and appellant Schultz. While the witness Dickinson testified that his brother and his son assisted him and took gauges and made entries thereof in the pumper's daily gauge reports, as they had been directed to do by appellant Schultz, he (Dickinson) visited the well every day and saw to it that the gauges were taken and the oil shipped, and in addition he examined the said record to see that it was kept up.

With respect to the blue book, exhibit 4, the witness Dickinson testified that each day that oil was shipped a record was made of the number of barrels shipped that day out of the particular tank, together with the name of the purchaser. Such information was obtained from the high and low gauges of the tanks and from the drivers of the trucks. That the gauge was taken "just as the oil went off the lease." Also, ". . . we had a calendar in the doghouse—we wrote this down on the calendar, the high and low gauge and who got the oil and the number of barrels and all, and the pencil and everything, and the book all stayed right here, both. We wrote upon both of them." This witness also stated that he transferred such information from the calendar to the blue book every day or every other day, and that when a truck driver received a tank load of oil or fluid from this tank he would give the pumper a receipt for so many gallons or so many barrels of oil. That "the amount of oil that was shipped out of the tank would show the high gauge that was taken and the low gauge that was left in the tank"; that the calendar, upon

which these original entries were made as the oil was shipped, was kept by the witness, his brother and his son, and that the entries in the book and on the calendar constituted the first permanent record of any kind that was made. Said witness also testified that he was present when the shipments of oil were made and when the high and low gauges were taken.

In connection with the several bundles of crude oil invoices (exhibit 6), taken from the files of the Operators Oil and Refining Company, the witness Hively, auditor for said company, testified in answer to the question, "By Mr. Cameron: Mr. Hively, how were these records prepared—what was the manner of their making?", stated: "Well, the manner of their making was, the shipment would come from the well in a truck and trailer, unloaded at the refinery, signed for by one of our operators, showing that the crude oil was received in the refinery and at the time of the complete shipment, why, the high and low gauge and the barrels, gravity and temperature would be brought into our office, showing that so many barrels of oil were shipped from the well as so stated, and we would verify that we had received the amount of oil from that well into our refinery." Also, that he had possession of these records in his office; knew where they were kept and filed; that they were kept in the regular course of business, and that they constituted a record of the oil purchased, the amount of money paid for it and to whom said money was paid; that he used these records in connection with his work during the period in question. While this witness testified on cross-examination that he made none of the entries on the tickets, and was not present when others made such entries, he also testified that the books of the company were kept in such a way that a person could check this data to see whether or not the amount of oil shown thereon was paid for. Further, that he relied upon the validity and accuracy of the tickets in his conduct of the business; that he was in the employ of the company when the records were made and that the run tickets had been in the possession of the company ever since they were made.

The witness Cate, auditor for Fletcher Oil Company, successor to Los Angeles Refining Company, testified respecting several bundles of run tickets or crude oil invoices, introduced as plaintiffs' exhibit 7, which were taken from the files of said refining company. On voir dire examination in answer to the question: "You personally don't know whether those figures

are or are not accurate, do you?'', said witness replied: ''Only in so far as after I went back there in September, for the purpose of State and Federal gasoline taxes, I made inventory reconciliations covering the whole year of 1935, at which time reconciliation inventories are based on the crude oil received according to these run tickets.''

The appellant Fairbanks, who was vice president of the Chief Oil Company during the year 1935, admitted that the readings taken by the pumpers at the well ''would be correct as to the amount of fluid—gross fluid.'' Also, that the Chief Oil Company was not selling oil from any other well from the middle of January until July 22, 1935, except from the Doyle well.

Appellants, in connection with their contention that the documentary evidence presented at the trial herein was hearsay and therefore inadmissible, contend that ''every single exhibit is essential if plaintiffs are to prevail''; that exhibits 2 and 3 cover only a portion of the period involved; exhibit 4 likewise covers only a portion, and exhibits 6, 6a and 7 cover only a portion of such period; and that while some of the exhibits constitute competent evidence against the corporate appellant, respondent's case must fall if any single link in the chain does not measure up to the standard required for competent evidence.

By the testimony produced, it has been shown that the pumper's daily gauge reports, exhibits 2 and 3, were kept in the usual course of business and for the purpose of showing the amount of gross fluid produced by the well during the time it was on production, and the appellant Fairbanks admitted that they were correct for that purpose. Plaintiffs' exhibit 4, the blue book, so-called, maintained by the witness Dickinson in which he kept a record of the oil that was shipped and sold beginning with the month of March, 1935, showed in one column the dates when the shipments of oil were made, in the next column the number of barrels shipped and in the next column the place to which the oil was shipped. These figures agreed exactly with the gauges or tank measurements appearing in the pumper's daily gauge reports, as well as with the record of the two refineries, plaintiffs' exhibits 6 and 7. Moreover, the witness Dickinson testified that the entries in this book were correct.

Many of these shipments recorded in the blue book, espe-

cially those therein stated to have gone to the Los Angele Refining Company and to the Operators Oil and Refining Company through the agency of one Doc Rhea, were not accounted for by appellants to respondents, but the records of these two refineries which were later introduced in evidence as exhibits 6, 6a and 7, showed that these identical shipments had been received by the refineries on the dates specified in the said blue book.

With respect to all of this documentary evidence, i.e., the run tickets or crude oil invoices taken from the files of the two refineries, the pumper's daily gauge reports and the blue book, it was clearly admissible under the provisions of sections 1953e to 1953h, inclusive, of the Code of Civil Procedure, denominated as the "Uniform Business Records as Evidence Act". Section 1953f, thereof, provides: "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the usual course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

It must be conceded that the testimony of the witnesses Hively and Cate, employees of the refining companies, was sufficient to establish the identity of the run tickets, the mode of their preparation and that they were made in the regular course of business of these two companies. This is also true of the records kept by the witness Dickinson for the corporate appellant.

Section 1953g, *supra*, requires that "This article shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those States which enact it."

In discussing these sections of the Code of Civil Procedure in the case of *Loper* v. *Morrison*, 23 Cal.2d 600, 608, 609 [145 P.2d 1], our Supreme Court stated: "The purpose of this act is to enlarge the operation of the business records exception to the hearsay evidence rule. The common law exception is based on the assumption that records kept in the general course of business usually are accurate, and may be used, in case of necessity, as evidence of the matter recorded. . . . But the exception has been hedged about with so many burdensome restrictions that legislation has been necessary to secure widespread use of such records. Speaking of the

desirability of similar legislation, the United States Supreme Court, in the recent case of *Palmer* v. *Hoffman*, 318 U.S. 109 [63 S.Ct. 477, 481, 87 L.Ed. 645, 144 A.L.R. 719], stated: 'The several hundred years of history behind the Act (Wigmore, *supra,* secs. 1517-1520) indicate the nature of the reforms which it was designed to effect. It should of course be liberally interpreted so as to do away with the anachronistic rules which gave rise to its need and at which it is aimed.' . . . It is the object of the business records statutes to eliminate the necessity of calling each witness, and to substitute the record of the transaction or event. It is not necessary that the person making the entry have personal knowledge of the transaction.''

In an analysis of the Uniform Business Records as Evidence Act which appears in 15 So.Cal.L.Rev. 37, 38, 39, it is stated: ''As worded, the act renders it unnecessary to call the various employees in the business or to account for their absence. The records may be adequately verified by the 'custodian or other qualified witness.' This is a point of departure from precedent. The traditional, accepted, principle has been that the person or persons participating in the transaction and the recording thereof must be called unless an acceptable excuse for not calling them is furnished. It is true that many courts have adopted a liberal policy in this regard, but the practice has been far from uniform and litigants frequently have been met with troublesome and unnecessary handicaps and needless time has been consumed. . . . Such records can be readily admitted, whether offered in litigation with his own customers to which he is a party or whether only relevant to litigation between third parties. . . . Moreover 'qualified,' as used in the act, probably was intended to mean only that the witness was sufficiently acquainted with the books to identify them and to testify as to routine of the business in the matter of making its records —the interpretation maxim *'ejusdem generis'* would relate the 'other qualifications' to those similar to custodianship.''

Appellants next contend that finding of fact No. 14 is not supported by any competent evidence. Said finding reads as follows: ''That in said written statements made by the defendants to the plaintiffs concerning the total number of barrels of oil produced from said well for the months of January and February and March and April, 1935, the de-

294

fendants also set forth in each monthly statement the amount of gross barrels of oil purported to have been produced and sold from said well and from which the number of net barrals of oil was claimed to have been obtained, and at the time of trial the plaintiffs introduced in evidence the records of the defendant corporation in the form of 'run tickets' and being a part of plaintiffs' 'Exhibit 1' and which purported to show the gross number of barrels of oil produced and sold from said well and which 'run tickets' formed a record of the production of all the gross barrels of oil accounted for by defendants to the plaintiffs, and which defendants claim was all of the gross barrels of oil produced and sold from said well; that by dividing the net sum of money received by the defendant corporation in any one month by the gross number of barrels of oil produced and sold in said month according to the records of said defendant corporation, there is obtained the average price per gross barrel for the oil so produced and sold in said month according to defendants' records, . . . that said method of computation is adopted for the reason that much of the proof of plaintiffs as to the amount of oil produced and sold from said well was given in terms of gross barrels as said term was used by defendants in accounting to plaintiffs as said term is used in said 'run tickets.' '' Then follows a table composed of seven columns: (1) showing the number of gross barrels produced from said well for each month; (2) the number of gross barrels accounted for to plaintiffs; (3) the number of gross barrels not accounted for; (4) the value of the oil not accounted for; (5) plaintiffs' royalty on the oil sold and not accounted for; (6) the accrued interest on the royalty from the date it became due to the time the complaint was filed herein; (7) the total amount of principal and interest due to plaintiffs on April 9, 1941.

In view of what has heretofore been said regarding the evidence adduced at the trial herein and the fact that this is an action for fraud and not for an accounting, as appellants frequently suggest in their briefs, it would appear that finding of fact No. 14 is amply supported. Moreover, respondents did not seek to recover from appellants any greater price, and were not awarded any greater price for the oil which was unaccounted for, than for the oil which was accounted for by appellants. In the circumstances presented,

it would appear that the method used by the court in computing the value of the oil unaccounted for was eminently fair and just.

■ With respect to appellants' contention that the court erred in rendering a judgment against the individual appellants Fairbanks, Schultz and Luke, because they were not parties to the contract and were not made liable by its terms, the record herein conclusively reveals that these three men as officers of the Chief Oil Company were in the actual control and management of the well here in question and actively participated in the plan to deceive respondents regarding the amount of oil produced and sold from the well. Having participated in the fraudulent plan, they are liable in damages therefor.

■ Appellants urge that exemplary damages are not allowable in an action for accounting based upon an express contract, and in support of this contention cite section 3294 of the Civil Code which provides for exemplary damages "In an action for the breach of obligation *not arising from contract,* where the defendant has been guilty of oppression, fraud, or malice, express or implied. . . ." Although the acts of appellants were fraudulent, such acts were related to and affected certain obligations "arising from contract," the violation of which resulted in the alleged damage to respondents; therefore, the award of $500 as exemplary damages herein cannot be sustained.

For the reasons stated, the judgment is modified by striking therefrom that portion of paragraph numbered 1, which awards to respondents the sum of $500 as exemplary damages, and as so modified, the judgment is affirmed. Respondents to recover their costs on appeal.

Doran, J., and White, J., concurred.

Reporter's Note: On May 29, 1944, the opinion and judgment were modified to read as above.