[Crim. No. 5772. Second Dist., Div. One. Apr. 15, 1957.]

THE PEOPLE, Respondent, v. JOSEPH WILLIAM VERODI, Appellant.

Eugene V. McPherson and Gladys Towles Root for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

FOURT, J.—In an information filed March 9, 1956, in the county of Los Angeles, it was charged that the defendant did on or about February 4, 1956, murder Marie Yvonne Verodi. The defendant pleaded not guilty and not guilty by reason of insanity. A trial by a jury was had on the not guilty plea which resulted in the defendant being found guilty of murder in the first degree, with a recommendation that the punishment therefor be life imprisonment. Thereafter, there was a trial by the court without a jury on the not guilty by reason of insanity plea and the court found the defendant to be sane. A motion for a new trial was made and denied and the defendant was sentenced to the state prison for life. This appeal is from the judgment of conviction.

The facts are substantially as follows: The defendant had been married to Carmen Verodi for about 10 years before the episode in question, and as the issue of the marriage, Marie

Yvonne Verodi was born about 9 years ago. The marriage had many unpleasantries and shortly before the Christmas season in 1955, the defendant told his wife that he could not go on living the way they were. He threatened to take the life of the daughter and to commit suicide; that he was not going to leave the daughter for the mother. On other occasions he made similar threats. On Christmas Day, in 1955, when the defendant was apparently drunk, he attempted to kill himself by using a pistol but Mrs. Verodi took the gun away from him. The incident was reported to the officers at the police department, but an officer thought it better to let him "sleep it off." On that date Mrs. Verodi left the defendant and with her daughter, Marie Yvonne, lived at 817 East Central Street in San Gabriel. The defendant resided with Mr. and Mrs. Elmo Powers at 811 South Bronson Avenue in Los Angeles. A few days later the defendant came to the house where Mrs. Verodi was staying and told the sister of Mrs. Verodi that if Mrs. Verodi "didn't come home and bring the gun with her he would make our home look like a roman candle." The wife stated that the defendant had never threatened her personally.

On February 1, 1956, between 1 and 2 o'clock p. m., the defendant went to the Pachmayr Gun Works, 1220 South Grand Street, Los Angeles, where he purchased a Smith and Wesson Chief Special .38 caliber revolver, paying therefor the sum of $61.39. He was told that he would have to wait a certain time and would have to secure what amounts to a police release before he could pick up the gun. The defendant came back to the gun store on Friday, the third day of February, 1956, with the proper documents from the police department and picked up the gun. The defendant told the clerk who sold him the gun that he wanted it to "shoot sharks off his fishing boat." The clerk stated that the defendant did not appear to him to be under the influence of liquor on February 1st, and that he appeared perfectly sober. The clerk who delivered the gun to the defendant along late in the afternoon on the day of the shooting observed the defendant at that time and stated that the defendant did not appear to be under the influence of intoxicating liquor.

The defendant called Mrs. Verodi during the day of February 3, 1956, and stated to her that he wanted to see the daughter because he was ill and was going to the hospital. Sometime shortly after 7 o'clock p. m. on February 3, 1956, the defendant did go to the house where his wife and daughter

were living ostensibly for the purposes of a visit. The daughter admitted the defendant into the house. Mrs. Verodi, who was in the kitchen washing dishes at the time, heard the defendant say to the daughter, "Put the latch on the door, baby." The latch was put on the door and the defendant called to Mrs. Verodi and asked her to come into the living room. He was told by Mrs. Verodi that she would be there in a minute as she was fixing some soup for the daughter, and the defendant called again and told her to come to the living room. Mrs. Verodi went into the living room and saw the defendant sitting on the right side of the divan. Mrs. Verodi inquired of the defendant if he was going to the hospital and the defendant answered that it was none of her business. The wife then asked him if he was ill, and she was told by him that it was none of her business. The wife put several other questions and to each the reply was, "It is none of your business" or "You will find out." Mrs. Verodi stated that the defendant "looked very sick," and she "knew something was wrong, and we just weren't getting anywhere talking." The wife became frightened and wanted to open the door, and seeing that the latch was on or that the "door was bolted down," she picked up the cat and opened the latch, put the cat out, closed the door, but left the latch off. The defendant insisted that the latch be put back on. Mrs. Verodi explained to the defendant that there was no reason to put the latch on, whereupon the defendant said "Baby, put the latch on the door," and Mrs. Verodi said, "Yvonne, you just leave it off; there is no reason for it to be on." The defendant then directed Mrs. Verodi to put the latch on, and she refused, and thereupon he stated that he would if she did not. Mrs. Verodi had wanted the daughter to go to the kitchen to eat her soup and the defendant would not let her and asked the daughter to bring it into the living room. The daughter was eating from the coffee table and when the defendant started toward the door, apparently to fix the latch, the daughter jumped up and ran toward the kitchen. The defendant followed her and Mrs. Verodi started toward them, saying, "Joe, don't scare the baby." The defendant then grabbed the daughter around the shoulder, as they were in the kitchen doorway, pulled the gun from his right hand coat pocket and held it against the daughter and shot her in the chest. Mrs. Verodi grabbed the hand of the defendant that held the gun, and at about the same time the daughter fell to the floor. The mother called to the daughter and told her to run next door, but there was no response from the daughter. Mr. and Mrs. Verodi struggled

while she was attempting to get the gun away from him. He was trying to point the gun at himself and she was trying to point it toward the ceiling. While they were so struggling, and he was attempting to put the latch on the door, Mrs. Verodi got the gun from him and he thereupon tried to get it back. She ran through the hallway, a bedroom, and out of a window to the house next door, where her parents and brother-in-law and sister lived. The brother-in-law, Harley Potts, took the gun from Mrs. Verodi and told her to stay in the house of the parents. Potts then returned to the house of Mrs. Verodi where the defendant was. When Potts entered the house he saw the defendant standing in the front room close by the front door and his eyes had a "glassy look." Potts went to the child and observed where the bullet had entered her chest. The defendant then came toward Potts, who told him to sit down on the couch, at which time the defendant said, "Shoot me"—"Shoot me, I want you to shoot me, Harley." The speech and manner of speech of the defendant were very plain. The father of Mrs. Verodi came into the house and Potts told him to call an ambulance and the police. Potts did not remember noticing alcohol on the breath of the defendant, but he did notice that the speech of the defendant was not at all thick. During the period of time just related the daughter regained consciousness and said, "Daddy, Daddy, why did you shoot me?" and the defendant made no response thereto.

The daughter died the next day, Saturday, February 4, 1956, at a hospital. An autopsy was performed by two doctors and the cause of death was ascribed "to gunshot wound of chest and abdomen, with massive hemorrhage."

Lieutenant Lloyd of the San Gabriel Police Department arrived at Mrs. Verodi's home at about 7:35 o'clock p. m., February 3, 1956, with Officer Rucker. Lloyd saw the body of Marie Yvonne lying face down, with a large amount of blood under her. Lloyd heard the defendant say to Potts, "I shot the baby, but it is all your fault." The officers took the defendant to the police station and Rucker took him into the officers' room. The defendant asked for and received a cigarette, and also asked the officer to get him some cigarettes, which was done from a vending machine. The defendant also got a drink of water at this time. During the booking procedure the following conversation took place between Rucker and the defendant, as related by Rucker:

"A. I asked Mr. Verodi why he shot his wife. He said,

142

'I didn't shoot my wife.' I says, 'Who did you shoot?' He says, 'I shot the baby.'

"I says, 'Who is the baby?' He says, 'That is my daughter.'

"I says, 'How old is she?'

"And he says, 'Nine years old.'

"I says, 'Why did you do that?'

" 'Well,' he says, 'I wanted to shoot her and shoot myself, but they wouldn't let me.'

. . . . . . . . . .

"Q. (By Mr. Smith, Deputy District Attorney) You asked Mr. Verodi why he wanted to shoot the baby? A. Yes. I asked Mr. Verodi why he shot the baby. He said, 'I did this so it would impress itself upon my wife's mind, so that she could carry this to her grave.'

. . . . . . . . . .

"Q. By Mr. Smith: Was there anything said after that statement that he wanted his wife to carry the memory to her grave? A. I said, 'Was your wife with you at the time of the shooting?' And he replied, 'Yes.' And I asked him where she was, and he said, 'Standing beside me.' "

Rucker also stated that the defendant had said that his wife "took the gun away from him after he had shot the baby."

The defendant was then taken to Lt. Nelson's office for questioning, during which time Rucker was present. Nelson testified that in his opinion the defendant was not under the influence of intoxicating liquor, nor under the influence of any drugs. The gun was shown to the defendant and he was asked if that was the gun he had purchased, and he stated, "It looks like the gun." Nelson also testified as follows:

"I asked him if he had had the gun in his pocket when he went in the house that night, and he said he had. I asked him if it was loaded and he stated yes, it was fully loaded. I asked him why he had taken the gun to the house and he said he had wanted to shoot his baby and kill himself but things had not worked out that way. I asked him if he wouldn't tell me what he meant by 'things hadn't worked out.' He stated his wife had taken the gun from him. I asked him if he had loaded— I asked him where he had loaded the gun. To the best of his knowledge he stated that 'I was at Crawford Market on Valley Boulevard.' I questioned him concerning the particular place, why that particular place, and he stated he had become hungry and had stopped and purchased a barbecued chicken at that location, and while he was in the parking lot, he had loaded the gun.

"I questioned him further regarding where the baby was when the baby was shot. He stated the baby was in the doorway between the kitchen and the dining room. I asked him if he had had hold of the baby. He said yes. I asked him where he had hold of or grabbed the baby. He stated he was not sure but he had used his left hand. I asked him, after the actual shooting and his story of his wife taking his gun from him, if he had attempted to leave the premises at all. He stated no, he had not, that he had remained there on the premises. I asked him concerning any drinking that he had done that day and he said he had consumed some liquor. I asked him in what amount and he was unable to tell me. He stated, 'I do not know,' or 'I don't recall.'

"I had several other questions concerning his occupation, concerning some of his family life, and any other questions that I asked him concerning the actual shooting. His reply was, 'For God's sake, don't ask me that,' or 'don't ask me any more.' One of those answers, I'm not certain which.

"Q. (By Mr. Smith) Did you ask him whereabouts he shot the baby? A. Yes. I asked him where he had recalled shooting the baby in relation to the physical body, and he placed his hand on his chest in this manner, and he said, 'I think it was somewhere near the heart.'

"Q. Did he tell you where he bought the gun? A. Yes, he said he had purchased it at Pachmyr's in Los Angeles, and that he had purchased it two or three days before, but because of the laws it was necessary for him to wait until that day, which he indicated as Friday the 3rd, before the gun was picked up."

Officer Ruiz found a spent bullet "in the service porch against the west wall." Laboratory tests indicated that it had been fired from the defendant's gun. A chemist compared fibers from Marie Yvonne's sweater with those found on the edge of the cylinder bore of the gun and found that the fibers taken from the gun were of the same type of fibers found in the sweater.

On February 4, 1956, the district attorney caused the defendant to be examined by Dr. Marcus Crahan, the medical director of the sheriff's department, who had made a special study of psychiatry over a period of 15 years. The doctor testified that the defendant admitted to him that a week before the killing he had bought the gun in question, and further testified:

"He stated that on the day before the recent incident he

had consulted his physician, who advised that he enter a hospital for X-ray studies and most probably gall bladder surgery. He felt that he would be able to face this ordeal if he could return to his home to convalesce, and on Friday, February 3rd, after calling his wife, he went down to their home to ask if she would permit him to come home following the anticipated surgery.

"Subject admits he had been drinking whiskey and water highballs all day.

"On arrival at the house at about 7:00 p. m., the defendant cannot recall the trend of conversation other than when he said something about going to the hospital his wife jumped up and asked, 'Do you want me to drive you to the hospital; is that all you want?'

. . . . . . . . . .

". . . He recalls calling to the child, but does not know if she ran from the room, stating that he thinks that she was standing there crying, but believes it possible he might have grabbed her. He knows only that his wife said something, that it could have been a threat to call her father or her brother.

". . . He knows only that he saw the child lying on the floor, that she spoke to him, saying, 'Daddy, why did you shoot me?' but is aware of no reaction to this or of an answer to the little girl. His first recollection is that of many people standing around, mostly neighbors, of his brother-in-law standing with the gun pointing at him, saying, 'Don't move or I will shoot you in the leg,' and thinks he replied to this by saying, 'Go ahead and be sure to shoot me in the heart.' He cannot recall if he threatened his wife, and hardly knows what went on.'

. . . . . . . . . .

". . . 'his occupational history shows a peculiar mixture of craftiness and stupidity. For many years he was in the juke box business, as promoter, collector, and operator. He was out-maneuvered on two or three occasions by his associates, then built a boat which he hoped to use in charter service but this venture proved unsuccessful . . .' "

The doctor stated that it was his opinion that the defendant was aware that he had shot his daughter the night before. At the time of the examination the defendant did not know that the child was dead and was told of the death by the doctor. The doctor also was of the belief and opinion that the killing was an act of aggression upon the part of the defendant, and that the acts of the defendant in getting the gun and going

to the home of the daughter and later shooting the child were all conscious acts on his part. In answer to the question:

"Q. BY MR. SMITH: Well, assuming that Mr. Verodi now claims that he doesn't recollect the events of that evening or that day, in fact, do you have an opinion as to his mental processes, or what caused him to have a present inability to recollect, if in fact he does presently fail to recollect? A. Yes.

"Q. Would you explain that, state that opinion, please? A. I believe that the instant he shot his child, the emotional shock of realization of the enormity of his act was so overwhelming that it created in him a retrograde, functional amnesia in a subconscious effort to wipe out from his memory the things that were horrible to him. And I believe that he has wiped them out from his memory. I don't believe he is falsely stating that he did not remember. I don't believe he can remember that instant.

"Q. Do you have an opinion as to whether or not he was acting consciously up to and including the time that he fired the fatal shot? A. Yes, I believe he was acting consciously up to the time and including the time he fired the shot.

"Q. And, in your opinion, was he or was he not suffering from any organic amnesia as he walked into the room and shot the child? A. He had no organic amnesia at any time.

"Q. Assuming that same evening, February 3rd, after his arrest, he made certain statements to officers at the San Gabriel Police Department; he was asked the question: 'Why did you shoot your wife?' and he answered, 'I didn't shoot my wife; I didn't even harm her'—pardon me just a minute.

"Assuming he was asked the question, why did he shoot his wife, and he said, 'I didn't shoot my wife.' He was asked the question, 'Whom did you shoot?' and he said, 'I shot the baby.' He was asked the question, 'Who is the baby?' and he said, 'That's my daughter.' And he was asked, 'How old is she?' and he replied, 'Nine years old.' He was asked, 'Why did you do that?' and he replied 'I wanted to shoot her and shoot myself, but they wouldn't let me.'

"Later on he was asked the question why he wanted to shoot the baby, or why he shot the baby, and he replied, 'I did this so it would impress itself on my wife's mind so she would carry this to her grave.'

"Now, would Mr. Verodi's statements, assuming Mr. Verodi made those statements, could you state an opinion as to whether or not Mr. Verodi possessed sufficient understanding to have comprehended the significance of that confession?

"A. Yes, I believe he had sufficient comprehension of the significance of it.

"Q. Do you have an opinion as to whether or not he was conscious of what he was saying and understood the import of his words and acts, and appreciated their significance? A. I believe he was."

Mrs. Powers, the landlady of the defendant, testified for the defendant, and in substance stated that on the night of February 2, 1956, she saw the defendant when he came home from work about 5.45 o'clock p. m., and that at such time he was on a couch in the den in a stupor, half asleep. Further, that he had refused to eat at her house during the three weeks he was there, and that it was her opinion that he was under the influence of drugs.

Robert Craychee, a pharmacist called by the defendant, stated that on January 29, 1956, he had filled a prescription for the defendant of 50 three-grain Tuanol pills. Tuanol is not a narcotic, but is a barbiturate or a hypnotic.

Bill Kolman, a defendant's witness, said that he was with the defendant when he took delivery of the gun on February 3, 1956, and further that the defendant had told him that he had sold his boat and that he told the buyer that there was a gun aboard and when the buyer was unable to find the gun that the defendant told the buyer he would purchase one for him. The witness noticed that the defendant was different on this particular occasion, his eyes being glassy and partially closed, and it was his opinion that the defendant was under the influence of some kind of a drug or narcotic.

A Joseph Hughes testified that he had known the defendant for about 11 years and that when he saw him on February 3, 1956, between 11 and 12 o'clock a. m., the defendant appeared to be "very despondent."

The defendant testified in his own behalf and stated that he was employed as a grinder at a plant in Los Angeles, that he had no recollection of leaving his place of abode on February 3d. He stated that he did remember going to a bar located at Main and Pico streets in Los Angeles, but that he did not recall very clearly where he went after he left that bar, except that he did remember stopping at a liquor store and buying half a pint of whiskey. It was related that he was taking the capsules he had secured from Craychee to make him sleep, and that when he did not get the result desired he would take whiskey with them. He stated that he recalled buying the gun but said that he could not remember taking

delivery of it. He further testified that he remembered making a call to Father Montoya, but could not recall the time of day that such call had been made and that he had no recollection of anything which had occurred in his wife's home; that he did not remember seeing Potts; did not remember talking to the police, being booked or searched, and denied having any recollection of the statements which he had made to the police. He said that his recollection commenced with his activities on February 4, 1956.

A Dr. Arthur Chandler, who stated that he practiced psychiatry, testified on June 13, 1956, that he had first seen and examined the defendant the day before, and that in his opinion the defendant suffered amnesia for a period of three weeks following his arrest which was caused by his "psychosis and, during the period when he was taking drugs and alcohol, accentuated by those" and that relative to the time of the killing "that at that time he was in a paranoic psychosis, in which he could not formulate any intent in keeping with his conscious normal mind." The defense also called Dr. Claude Movius, a physician and surgeon engaged in general practice, who had talked with the defendant on January 30, 1956, and the doctor stated that it was his opinion that the defendant was "conscious of his acts."

Father Michael Montoya, a member of the Claretian Fathers and pastor of San Gabriel Mission, testified as a witness for the defendant that he had met Mrs. Verodi and the defendant; that the defendant had been in his rectory; that the defendant had frequently called him on the telephone and that on February 3, 1956, about 1 o'clock p. m., he received a telephone call from the defendant and at such time the defendant's voice sounded nervous and it became angrier and angrier, but not hysterical. Further, that the defendant did not sound like he was intoxicated, that the conversation was rational and that the defendant sounded like he was perfectly conscious of what he was saying.

The defendant now contends that the court committed error in the giving of an instruction on the subject of unconsciousness and burden of proof; that there were errors of law as to the admissibility of certain evidence and that the evidence is insufficient to support the judgment.

 Among others, the following instruction was given to the jury:

"When the evidence shows that a defendant acted as if he was conscious, the law presumes that he then was conscious.

This presumption, however, is disputable and may be overcome or questioned by evidence to the contrary, and, if you should find that the defendant committed an act, which, if he was conscious, would have constituted the crime charged against him or have been an element of that crime, and if you should not be convinced beyond a reasonable doubt that he then was conscious, you shall find that he then was *un*conscious.''

The defendant asserts that the instruction is error and cites as authority therefor *People* v. *Hardy,* 33 Cal.2d 52 [198 P.2d 865]. The instruction which was given in this case was not the one which was given in the Hardy case. The instruction here was prepared by the authors of CALJIC after the Hardy decision, and apparently for the purposes of correcting the claimed error in the instruction set forth in the Hardy decision and the original volume of CALJIC. (See CALJIC, Pocket Parts, 1953, p. 49, for criticism.) In the Hardy case the court held that the instruction was so worded that it required that the presumption of consciousness be overcome by a preponderance of the evidence—that the defendant then had a burden which was not his. There is no such phraseology in the given instruction in this case. We believe it was a proper instruction under the circumstances. There was certainly ample evidence in the record in this case from which the jury could conclude that the defendant was perfectly conscious of his acts at all times, that he had the mental capacity to plan and scheme the crime which he committed and that he had the required specific intent to do just what he did do.

The defendant also contends that Officer Rucker was erroneously permitted to use a memorandum to refresh his recollection. The officer was on the witness stand and had testified concerning a conversation he had had with the defendant wherein the defendant had stated that he had shot his 9-year-old daughter and that he wanted to shoot her and then shoot himself, but they would not let him, and that he did this to impress upon his wife, who would carry the memory to her grave. The above set forth matter is all that the officer could recall of the conversation at the time, but that his recollection would be refreshed by looking at his notes made of the conversation. Counsel for the defendant examined the officer on a voir dire examination, wherein it was developed that the witness had a conversation on February 3, 1956, with the defendant, that the witness took some notes of the talk and the next day or so dictated to a stenographer the contents of the memorandum, which had evidently been typed, and which was

dated February 6, 1956, and consisted of three pages. The officer then stated that he did not think he needed the memorandum to refresh his recollection and the defendant thereupon objected to the use of it. The court then stated: "Obviously, if the officer doesn't need it to refresh his recollection, there is no need of using it. You may proceed." The following then took place:

"Q. BY MR. SMITH: What was said after Mr. Verodi said he wanted to do that to impress itself on his wife's mind so she will carry it to her grave?

"MR. McPHERSON: Objected to as asked and answered. The witness said nothing was said after that time. He has already purported to give the entire conversation by question and answer.

"THE COURT: Let us find out if he has given the entire conversation. You may answer. A. I think that is all that was said at that time, your Honor.

"MR. SMITH: Then it is obvious you do need to refresh your recollection, Mr. Rucker.

"MR. McPHERSON: Just a minute. I object to him taking the memorandum up and showing it to the witness, because the witness has already testified he doesn't need it. And he has already given what purports to be the entire conversation. I will object to any other questions about the use of the memorandum.

"THE COURT: I think the witness may be shown the memorandum if there is something that should be recalled to his memory.

"Q. BY MR. SMITH: Was there anything said after that statement that he wanted his wife to carry the memory to her grave? A. I said, 'Was your wife with you at the time of the shooting?' And he replied, 'Yes.' And I asked him where she was, and he said, 'Standing beside me.' "

Later, substantially the same course was followed and the witness referred to the memorandum to refresh his recollection as to further conversations with the defendant wherein the defendant had said that after he shot the baby his wife had taken the gun away from him. It is perfectly clear from a perusal of the record that the officer did not relate the entire conversation, prior to his seeing the memorandum, and even though the witness was of the impression that he had testified to everything which had been said, and even stated in effect that he did not need the memorandum to refresh his recollection, we are of the opinion that it was proper under the

circumstances for the district attorney to refer the witness' attention to the memorandum which he, the witness, had prepared, for the limited purpose of refreshing his recollection and to correct a perfectly obvious omission. (Code Civ. Proc., § 2047; *People* v. *Gardner,* 147 Cal.App.2d 530 [305 P.2d 614].)

Here the witness obviously had no present recollection while on the witness stand of any conversation with the defendant, other than that which he had previously related, and was of the belief, evidently, that the memorandum would not induce a refreshing of his brain. The district attorney, apparently, had the memorandum before him while questioning the witness and could easily determine that some of the conversation had between the defendant and the witness was not being related. Surely, in the interests of truth and accuracy, it was proper for the district attorney to proceed as he did. Some persons are able, in situations involving events of importance, to have a vivid and clear recollection of what was said and done, and thereafter need no memory refresher. Sometimes, however, events involving routine investigations and so forth, fade in the recollection of a witness. It is to be noted that the district attorney did not attempt to get the memorandum before the jury or to cause the same to be introduced into evidence. It is not claimed that there was any testimony given which is not set forth in the memorandum. Counsel for the defendant took the opportunity to carefully inspect the document before the witness used the same to refresh his recollection therefrom and properly examined the witness on voir dire as to the time the document was prepared and all of the circumstances surrounding it. The defendant could have used the memorandum if he had been so minded in cross-examination to bring out any discrepancies between the writing and the testimony, if any there were. The memorandum itself was not evidence, but it only assisted the officer in giving accurate testimony. The witness evidently believed that he remembered and had related completely all of what had been said and done and apparently he was at least hesitant to admit at first that he was afflicted with that ailment which is common to all human beings, namely forgetfulness. A reference to the memorandum at once served to make him recall added facts. The Chinese had a proverb which is pertinent, ''The palest ink is clearer than the best memory.''

It is our opinion that the witness can refresh his memory from a memorandum such as was done in this case.

The defendant also contests the sufficiency of the evidence, and particularly argues that there was no evidence of premeditation or the forming of a wilful intention to kill another person with malice aforethought. Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187.) All murder which is wilful, deliberate and premeditated is murder in the first degree. (Pen. Code, § 189.)

Here the defendant had on many occasions threatened to take the life of his daughter, and two days before the killing he bought the gun, got some ammunition someplace, stopped at a parking lot on the way to the house and loaded the gun. The defendant was obviously preparing for the killing. On the night of the murder he entered his wife's and child's home under circumstances which indicate that he had murder in his thoughts. At the house he insisted upon locking or bolting the door and his conduct demonstrated that he had something very serious on his mind. When the child started to leave the room where he was seated, he got up, grabbed the child and deliberately pulled the gun from his right-hand coat pocket, held it against the child and shot her in the chest. The conversations at the police department indicate that he knew what he was doing. In our opinion, it was a cold, calculated and deliberate murder, and under our law the defendant was indeed fortunate to get the recommendation of life imprisonment from the jury.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.