[Crim. No. 7178. Second Dist., Div. One. Nov. 4, 1960.]

THE PEOPLE, Respondent, v. ANDREW TRACEY
PORTERFIELD, Appellant.

Ivan R. Wainer for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment, an attempted appeal from a sentence, and the denial of a motion for a new trial, rendered against the defendant in a case involving several counts of grand theft.

In an indictment in Los Angeles County, the defendant was charged with five counts of grand theft. Three counts (Counts I, II and IV) alleged that defendant took certain automobiles and two counts (III and V) alleged that he took certain monies. It was also alleged that defendant had twice before been convicted of felonies. Defendant pleaded not guilty and ultimately admitted the prior convictions. He was found guilty of Counts I, II and III and not guilty of Counts IV and V. A motion to strike the prior convictions was granted. The defendant was placed on probation for five years, a part of the terms of probation being that he spend one year in the county jail and that he take psychiatric treatment.

In Count I defendant was charged with violating the provisions of section 487, subdivision 3, of the Penal Code in that on or about July 27, 1957, he took a certain automobile belonging to Ted Miller. On about April 17, 1957, the defendant, through a company with which he had an association bought a new Corvette Chevrolet car from a dealer (Harry Mann Chevrolet Company). The dealer kept certain card records which described the car and also contained certain code, serial and key numbers. The card record for the car in question reflected a serial number of E51S102990, and a key number of 8058. The production motor number was F102CS which on the particular type of car involved appeared on the fuel injection system. The car was resold by the defendant to Ted Miller in July of 1957. The license number was MYS 902. About 20 days after Miller had purchased the automobile (on July 26, 1957), the car was stolen. Miller signed a police report of the missing car on July 26, 1957.

The defendant and Norman Atteberry, on May 13, 1958, entered into a business known as the Pit Stop, doing repair

work and other things to Corvette automobiles. The business acquired a Corvette racer from defendant in June, 1958. The car was being used in racing by the business. Atteberry was told that defendant had purchased the car as a wreck from a Michigan owner. On September 11, 1958, the car was in good mechanical condition. On September 12, 1958, there was a fire at the Pit Stop and the car in question suffered extensive damage. The Corvette automobile had a fiberglass body, the resin compound that forms it being a highly inflammable material. The fuel injection system, costing $400, had been removed from the car before the fire and the tires had been taken off to be recapped. A report of the fire was made to the insurance company. The car was sold to Underwriters Salvage. The Pit Stop received almost $4,000 as a result of the loss and transferred title to Fidelity Casualty Company. The money from the insurance company was deposited in the company (Pit Stop) account and ultimately went to the appellant. The business with Atteberry was dissolved October 1, 1958. About September 30, 1958, Southern California Auto Wrecking Company purchased a Corvette which had been burned from Underwriters Salvage, the liquidating concern of several insurance companies. F102CS was a number taken off the car.

It was stated that the serial number on a Corvette is not only affixed to the door post with a loose metal strip but is also stamped into the frame of the car as a permanent number. The stamped number of the frame is not readily visible but by the use of a mirror and flashlight the number can be read between the fiberglass body and the frame. An agent of the National Automobile Theft Bureau went to the yard of Sam Cohen, Southern California Auto Wreckers and with the police found on the Corvette at such establishment the serial number E51S102990 and the production number F102CS.

The evidence with reference to the second and third counts was interrelated. In August 1957, Laurence Clark, Jr., who owns a service station and garage, sold appellant a wrecked Corvette automobile which had been burned. The Department of Motor Vehicles records of titles reflected an engine number E56001036 for a 1956 Corvette. The documents also reflected two license numbers, NKB 635 and EGK 668. Such car had been purchased from a dealer (Harry Mann Chevrolet Co.) as a used car. Title was placed in the appellant.

Another dealer (Courtesy Chevrolet) had a black and silver Corvette displayed for sale purposes on a car lot. The car

was missing on or about October 19, 1957. The dealer had a hard-card office record on the car. Defendant sold a 1956 Chevrolet Corvette to Crenshaw Sport Cars in October of 1957. There was a serial number of E56S001036 on the door post and in the papers having to do with said automobile. Crenshaw Sport Cars paid $2,375 for the car.

In November 1957 the car was resold to Richard Wilbank. The car was repossessed on February 20, 1958. On February 25, 1958, the car was resold to A. R. Moriarity. It was repossessed when it was badly wrecked. The remains of the car were sold to Donald McDonald who did business as Korvette Korner and specialized in reconstruction with fiberglass.

In October or November 1958, Mrs. Bernice Freeman purchased a Corvette from McDonald who stated that he had a power of attorney from Moriarity to sell the automobile. The license plate was NKB 635. Roger Freeman, for whom the car was purchased, met the defendant the day the car was purchased from McDonald.

On about April 16, 1959, the police went to the Freeman home and checked the numbers in the office and found that the serial number on the frame of the car was E57S102302 and that the serial number on the door post was E56S001036.

Four flexible wrenches were found in the defendant's garage, each marked ''T.L.M.'' The wrenches were in Miller's Corvette when it disappeared.

In the course of the trial the prosecution was permitted to reopen its case for the purposes of introducing certain evidence with reference to the date of the stealing of Miller's car.

Appellant now contends (1) that the prosecution should not have been permitted to reopen its case; (2) that the impeachment of the witness Miller was prejudicial; and (3) the admission into evidence of certain business records (i.e., hard cards) was error.

 The theory of the prosecution as to Count I was that defendant had stolen the Miller Corvette car. In the proceedings it was apparently assumed by the prosecution that the theft had occurred on July 27th and questions were put to the various witnesses as though such was the date of the theft. Miller was never, in the earlier stages of the trial, asked the direct question as to what date the car was actually stolen. The defendant produced an alibi witness for the date of July 27th. In general that testimony was to the effect that defendant was engaged in a race on July 27th and therefore

could not have been present at the stealing of the Miller automobile. The prosecutor rechecked the dates involved and found that the actual date of the theft of the Miller car was July 26th; that there was a stolen car police report dated the 26th. After the defendant had rested his case the prosecutor then, by way of rebuttal, called Walter Maxwell, Jr., a policeman, who was to testify that he made out the police report on the Miller stolen car on the 26th of July. Further, the prosecutor represented to the court that Miller would be back in court in a few minutes and would use the police report to refresh his recollection that the car was stolen on the 26th of July and not the 27th. The defendant objected to any such testimony upon the grounds that it was an effort to impeach the witness of the prosecution. The court convened in the judge's chambers, out of the presence of the jury, to consider the objection. The judge in chambers said among other things:

"Now, here I don't think any of us can argue that the purpose is anything other than refreshing the witness's testimony and giving him an opportunity to correct his testimony and to reconcile it with his prior statements.

"Certainly, the People aren't trying to discredit their witness; they are not trying to impeach their witness and it is true, they may be trying to get the prior statement in evidence, but they are trying to get it into evidence only for the purpose of reconciling it with his present testimony and giving the witness a chance to correct it and change his present testimony.

. . . . . . . . . . . . . .

"In the Zammora case, there was a discussion that certainly the People couldn't, under the guise and pretense of refreshing a witness's testimony, actually impeach him, but it is a question of fact in each case and I think we have a different situation here than we have in the Zammora case, so I am going to have to indicate that I will overrule objections based on the contention that this is impeachment."

The deputy district attorney made a motion to reopen the case for the purpose of allowing the witness Miller to look at his signed police report of July 26th for the purpose of refreshing his memory under the theory of past recollection recorded. The defendant objected to any such procedure. The deputy district attorney stated that it was not until after the alibi witness for defendant had testified that he made a double check and found the police report; that he had theretofore relied upon a résumé of the grand jury proceedings which was

prepared by another deputy district attorney wherein it was set forth that the car apparently was stolen on the 27th, although Miller had never stated in so many words that the car was stolen on the 27th of July. The judge went on to say:

"On the other hand, when the People did discover the discrepancy in dates, the defendant, through his counsel, was immediately advised of that and that was yesterday and so, it isn't being brought up for the first time now. At least there is one day's prior notice on it and it seems to me that, taking everything into consideration, that the jury should be given all of the testimony and that the People should have the right to reopen their case for the purpose of presenting this additional evidence which the Court has already held to be evidence of refreshing the memory of the witness rather than impeachment."

The judge also said in effect that if the defendant wanted a continuance for the purpose of making an investigation as to where he might have been on the 26th of July, such continuance would be granted. The deputy district attorney stated that he was agreeable to any continuance for such purpose and would make no objection to such a procedure.

The court then granted the motion of the People to reopen for the purposes of offering the added testimony.

The cause was then reopened and the officer identified the theft report as one of a type which he regularly filled out, this one as having been signed by him and his officer partner and Ted R. Miller, and he further stated that the report was composed on July 26, 1957, and showed on its face that it referred to a theft of an automobile between noon and 3 p.m. July 26, 1957.

Miller was then called as a witness and he stated in effect that when he thought back on the matter, that the car was taken on a Friday, that he had refreshed his memory, that he remembered that he had not gone to work on Saturday, the 27th. Miller looked at the police report which was then in evidence and identified his signature thereon and stated that he signed the report on the day the car was stolen. Miller then stated positively in answer to a direct question that the car was stolen on the 26th of July 1957 and that he based such statement on his recollection after having talked with his wife and with his insurance agent and in part by having looked at the police report. Miller had not seen the police report or any other document prior to testifying before the grand jury. He told the grand jury that the automobile was

stolen about two weeks after he got it. In the grand jury hearing Miller was asked, "on the 27th of July, 1957 did you miss your Corvette?" and he answered, "Yes."

The defendant did not accept the offer for a continuance. On the next trial day defendant produced an alibi witness for the 26th day of July.

There is no showing in this case to the effect that the prosecution deliberately withheld any evidence until after the defendant had finished with his case. In fact the exact opposite occurred and immediately upon ascertaining the error in dates the prosecutor advised the defendant and court of the true situation. The trial judge had all of the parties before him and was able to ascertain from direct statements of counsel whether the situation was as represented and pictured by the prosecutor.

The facts in *People* v. *Robinson,* 179 Cal.App.2d 624 [4 Cal. Rptr. 50], are not comparable to the facts in this case.

 It was said in *People* v. *Carter,* 48 Cal.2d 737, 753 [312 P.2d 665] :

"Section 1093, subdivision 4, of the Penal Code provides that after the defendant has offered his evidence, the prosecution may then offer 'rebutting testimony only, unless the court, for good reason, in furtherance of justice . . .' permits it to offer evidence upon its original case. In a sense all evidence that tends to establish the defendant's guilt over his protestations of innocence rebuts the defendant's case, but it is not all rebuttal evidence within the purpose of section 1093, subdivision 4. The purpose of the restriction in that section is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of the trial with an additional piece of crucial evidence. Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. (See *People* v. *Byrd,* 42 Cal.2d 200, 211-212 [266 P.2d 505], cert. denied, 348 U.S. 848 [75 S.Ct. 73, 99 L.Ed. 668] ; *People* v. *Nye,* 38 Cal.2d 34, 38-39 [237 P.2d 1] ; *People* v. *Avery,* 35 Cal.2d 487,

491 [218 P.2d 527] ; 6 Wigmore, Evidence 510-511, 516 [3d ed. 1940].)''

 In this case there was no disorderly presentation of the evidence, the jury was not confused and there was no effort to magnify the matter of the date at the last minute.

 Appellant asserts that the testimony of the officer and Miller was in fact impeachment of the prosecution's own witness and that such is contrary to the provisions of sections 2049 and 2052 of the Code of Civil Procedure. For background and history of the rules so set forth in such sections see volume 3 of Wigmore on Evidence, section 896. See also sections 897-899 of the same work for comment. Wigmore states, ''There is no substantial reason for preserving this rule—the remnant of a primitive notion.'' McCormick in his book on Evidence at pages 70-71 states:

''Among the reasons, or rationalizations, found for the rule are, first, that the party by calling the witness to testify vouches for his trustworthiness, and second, that the power to impeach is the power to coerce the witness to testify as desired, under the implied threat of blasting his character if he does not. The answer to the first is that, except in a few instances such as character witnesses or expert witnesses, the party has little or no choice. He calls only those who happen to have observed the particular facts in controversy. The answers to the second are (a) that it applies only to two kinds of impeachment, the attack on character and the showing of corruption, and (b) that to forbid the attack by the party calling leaves the party at the mercy of the witness and his adversary. If the truth lies on the side of the calling party, but the witness's character is bad, if he tells the truth he may be attacked by the adversary: if he tells a lie the adversary will not attack him, and the calling party, under the rule, cannot. Certainly it seems that if the witness has been bribed to change his story, the calling party should be allowed to disclose this to the court.

''The most important, because most effective, kind of impeachment, however, is by inconsistent statements and nearly all the cases applying the rule are of this type. It is hard to see any justification for prohibiting this sort of showing as to the reliability of a witness who has testified contrary to his previous assurances. It is believed that the underlying reason for the opposition to change is not that this type of impeachment is unjustified as impeachment, but the fear that the

previous statement will be considered by the jury as substantive evidence of the facts asserted.''

See also Witkin on California Evidence, pages 717-719, where it is stated:

''The rule has been widely condemned by authoritative writers, who argue that (1) a party does not necessarily have free choice of witnesses but must take those who know the facts, and therefore cannot 'vouch' for them; (2) the supposed improper coercive power over the witness is largely illusory, for the common ground of impeachment is prior inconsistent statements, and attacks on character are rare. (See McCormick, p. 70; 3 Wigmore, §§ 898, 899; Selected Writings, pp. 412, 437.) Accordingly Uniform Rule 20 (following Model C., Rule 106) abolishes the restriction by allowing 'any party, *including the party calling him*,' to impeach a witness. The Comment states that this rule makes him 'the witness of the court as a channel through which to get at the truth.'

''The California statute (C.C.P. 2049) and the case law go part of the way in liberalizing the process. Thus: (a) The exclusionary rule does not apply to every kind of witness called by a party (*infra*, § 681.) (b) It does not prevent refreshing recollection (*infra*, § 682.) (c) *Unrestricted* impeachment by contradictory evidence is allowed (*infra*, § 683). (d) Impeachment by prior inconsistent statements is allowed upon a showing of surprise and damage (*infra*, § 684 et seq.).''

The rule does not prohibit the refreshing of recollection. It is said in Witkin, California Evidence, section 682, as follows:

''A witness may sometimes give unfavorable or inadequate testimony as a result of faulty memory, and it is entirely proper for counsel to refresh his recollection by calling attention to his prior statements and giving him an opportunity to correct and explain his testimony, instead of allowing it to stand and be attacked on cross-examination. (*Cummins* v. *Yellow etc. Cab. Co.* (1932) 127 C.A. 170, 15 P.2d 536; *People* v. *Curtis* (1939), 36 C.A.2d 306, 322, 98 P.2d 228; see *supra*, § 597 et seq.)''

Appellant relies heavily upon *People* v. *Zammora*, 66 Cal. App.2d 166 [152 P.2d 180]. The procedure followed in the Zammora case is not the procedure followed in the case before us. ▆▆▆ In the Zammora case, however, the court at page 217 said among other things:

''. . . The test is whether the reference to the former testi-

mony is for the purpose of giving the witness an opportunity to correct and explain the former testimony without waiting for the assault of cross-examination, or to get before the jury a former statement or testimony of the witness contrary to his present testimony with the object in view of discrediting the verity of the testimony presently given. In the latter case it is impeachment and not a refreshing of the memory or recollection of the witness. If the purpose of the examination is to reconcile or explain testimony, the memory of the witness may be refreshed, but if it is to contradict or discredit the present testimony of the witness and to have the contradiction stand unreconciled and unexplained, then it is impeachment, and a pretense of refreshing the memory by reading former testimony cannot be made a subterfuge to get before the jury incompetent evidence or statements which aid the case of the prosecution. (*People* v. *Creeks,* 141 Cal. 529, 532 [75 P. 101].)''

In this case there were no prior statements which had been made by the witness and put before the jury with which Miller disagreed at the time of trial. The witness simply and plainly corrected his testimony. The very essence of impeachment is that there is a disagreement between what was formerly said and what was said at the trial. There is no disagreement in this case insofar as Miller is concerned with reference to the date on which his car was stolen.

The police report was used to refresh the recollection of the witness. (*Watson* v. *Los Angeles Transit Lines,* 157 Cal. App.2d 112, 117-118 [320 P.2d 890] ; *People* v. *Verodi,* 150 Cal.App.2d 137, 148-150 [309 P.2d 568].)

With reference to the granting of the motion to reopen the case, the defendant has presented no authorities to indicate that it was an abuse of discretion under the particular circumstances in this case. It is the duty of appellant to demonstrate the error if there was any error and it is not incumbent upon this court to examine the record independently in search of such alleged error. (*People* v. *Montez,* 175 Cal.App.2d 303 [345 P.2d 938].) Leave to reopen a case is within the sound discretion of the trial judge. (*People* v. *Berryman,* 6 Cal.2d 331, 338-339 [57 P.2d 136] ; *People* v. *Oxnam,* 170 Cal. 211 [149 P. 165] ; *People* v. *Bloemsma,* 171 Cal.App.2d 261, 266 [340 P.2d 350].) There was no abuse of discretion by the trial judge in this case.

Finally, appellant asserts error in that the trial court permitted the introduction into evidence of ''hard cards''

although the "People failed to lay the proper foundation for the admission of said cards as required by Code of Civil Procedure, Section 1953(f)." Code of Civil Procedure, section 1953f provides as follows:

"A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

The "hard card" *accompanies* a car when it is delivered to the car dealer by the factory. It contains information relating to the date of delivery, the type of automobile, the serial number, key number and the production code number of the particular car that was delivered by the factory.

With reference to Count I, the serial number of the car sold to appellant by Harry Mann Chevrolet Company was established by use of the hard card. The witness who was an officer in the company and the custodian of the records testified that the manager of the "new car get-ready department" checked the information contained on the card *against the particular vehicle to ascertain that all information contained thereon is correct.* On the particular hard card in question an employee of Harry Mann Chevrolet Company had written in some information. The card is kept as a business record of Harry Mann Chevrolet Company and it was the practice to thereafter refer to the numbers contained on the hard cards and affix them to the other documents. After a particular vehicle is sold the card is retained as a business record (i.e., it is sent to the service department and "we . . . use it for our records in the service department").

Appellant contends in his brief that "the said hard card was not the business record of . . . Harry Mann Chevrolet Company . . . but was in truth and in fact a record prepared by the Chevrolet Division of General Motors, and that there is no testimony in the record which establishes its mode of preparation, and that it was made in the regular course of business as provided by the aforesaid code section."

This contention was adequately answered by the trial judge when he stated:

"Well, I don't think that the fact that some of the information on this hard card may have been placed thereon by some-

one connected with another company precludes it from being a business record of this particular company because the testimony of the witness was that upon receiving the hard card with the automobile, *the information is checked and verified,* other information added to it and thereupon it is adopted as one of their business records. . . . (Emphasis added.)

". . . I think here the action and conduct on the part of this company were sufficient, so I will overrule the objection."

The record discloses that there was great circumstantial probability of trustworthiness in these particular records. (See *Doyle* v. *Chief Oil Co.,* 64 Cal.App.2d 284, 292-293 [148 P.2d 915].)

The "preparation" called for by the statute was adequately satisfied by the process of checking the numbers described by the witnesses. The dealer did not merely rely upon the accuracy of the "hard card" as received, but actually checked the accuracy of the material appearing on the card against the numbers appearing on the particular vehicle itself.

It is difficult to distinguish between a situation where the dealer starts with a blank hard card and has one of his employees fill in the blank spaces with the numbers which he secures from a check of the car, from the situation where the dealer receives a "filled in hard card" and checks the accuracy of the material appearing on the card against the particular car itself.

With respect to the hard card which was introduced in relation to Count I, it appears from the record that the serial number, the major point of identification, was put on the card at the dealer's in the ordinary course of business. It is only in respect to Counts II and III where no information was filled in by an employee that the above discussion becomes pertinent.

With reference to the latter two counts, Richard Landfield, a sales manager of Courtesy Chevrolet, related that a "hard card" accompanies a new car; that the card is kept on file until the sale and then it is affixed to the permanent copy. Appellant objected to the basing of testimony on the card. The trial court overruled this objection, as well as one to the admissibility of the cards. A further foundation was laid. It was determined that Courtesy Chevrolet checks the serial number on the automobile itself against the numbers which appear on the card when the vehicle is first delivered from the factory. These numbers are again checked every subse-

quent month during inventory; as a regular business custom of Courtesy Chevrolet. The card becomes part of the files of the business.

Appellant conducted a *voir dire* examination. He learned that the cars are checked in at the warehouse in a different location. The witness, who was a salesman at the time the particular car was checked in, had no connection there. The witness did not see this particular car checked in but had seen it done on other occasions. The following appears in the reporter's transcript:

"THE COURT: In any event, the practice is for the man at the warehouse to verify the information and then to send it along into the records without making check marks?

"THE WITNESS: No, there are no check marks.

"THE COURT: All right, the objection will be overruled."

For the reasons stated, the trial court did not err in permitting the hard cards to be introduced into evidence.

The purported appeals from the sentence and the nonexistent order denying the nonexistent motion for a new trial is dismissed, and the order granting probation is affirmed.

Wood, P. J., and Lillie, J., concurred.