Leif TAYLOR, Petitioner–Appellant,

v.

Thomas M. MADDOX, Interim Director; George Galaza; Cal Terhune, Respondents–Appellees.

No. 02–55560.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 2003.

Filed May 10, 2004.

996

Sung B. Park, Van Nuys, CA, for the petitioner-appellant.

Deborah J. Chuang, Deputy Attorney General, Los Angeles, CA, for the respondents-appellees. Chuang was joined on the briefs by Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, and Kenneth C. Byrne, Supervising Deputy Attorney General.

* The Honorable Jane A. Restani, Chief Judge, United States Court of International Trade,

Before: KOZINSKI and NELSON, Circuit Judges, and RESTANI, Judge.*

KOZINSKI, Circuit Judge.

Petitioner is serving a life sentence without the possibility of parole for a crime committed when he was sixteen years old. The conviction hinges on a full confession petitioner gave after he was arrested in his home late one night and interrogated by two police detectives past 3:00 a.m. Pursuant to the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, § 104, 110 Stat. 1214, 1219 (1996), we consider whether the state courts were objectively unreasonable in finding that the confession was lawfully and voluntarily obtained.

**Facts and Procedural History**

On May 31, 1993, William Shadden was riding his bicycle through a beachside area in Long Beach, California, when two assailants attempted to take it from him. Shadden resisted and the assailants fled. Unwisely, Shadden gave chase and one of the assailants shot Shadden twice, killing him. Three months later, Detectives Craig Remine and William MacLyman, both of the Long Beach Police Department, came to suspect that Leif Taylor had been involved and obtained a search warrant for his apartment. Remine, MacLyman and at least two other law enforcement officers executed the search warrant and an arrest warrant for Taylor at roughly 11:30 p.m. on September 1, 1993.

sitting by designation.

They found Taylor sleeping on a couch in his living room; his mother, who was his only custodial parent, was apparently absent. Taylor was startled awake by four men with guns drawn and flashlights trained around the room. Taylor was permitted to dress; he was then handcuffed and driven to the police station. He arrived at the station ten minutes later, was escorted onto an elevator to the third floor and placed in a small interrogation room, where he sat alone for about thirty minutes.

By the time Remine and MacLyman entered and began to question Taylor, it was past midnight. For three hours, the detectives interrogated the boy, who "was considerably younger and physically smaller" than they. *People v. Taylor*, No. B091340, at 6 (Cal.Ct.App. Dec. 6, 1996) (mem.)[hereinafter Ct.App. Opin.]. Taylor "was given no food, offered no rest break, and may or may not have been given any water." *Id.* Neither Taylor's mother[1] nor an attorney was present to advise him during questioning. Taylor denied involvement in the crime "[f]or in excess of two and a-half hours," *id.* at 5, before finally inculpating himself. At the detectives' behest, he then memorialized on audio tape his confession and a waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Begun at 3:02 a.m. and completed at 3:13 a.m., the recording was just eleven minutes long; there is no record of the earlier two-and-a-half hours of questioning. This is so because Remine and MacLyman questioned Taylor without turning on the tape recorder eventually used to record his confession—or the hidden recording equipment installed in the interrogation room—until after he had inculpated himself. Remine took notes during the questioning but subsequently disposed of them.[2] There is no videotape, so we cannot see whether Taylor was calm and cool or tearful and agitated; nor do we have the audio tape to listen to.[3] Indeed, there is no contemporaneous record at all of what happened during most of the time that Taylor spent in the interrogation room with Remine and MacLyman.

The tape of Taylor's confession was played for the jury during the prosecution's case-in-chief. The jury subsequently convicted Taylor of first-degree felony murder and second-degree robbery; he was sentenced to life without the possibility of parole. The California Court of Appeal (Second District) (Ortega, Acting P.J.) affirmed; the California Supreme Court denied his petition for review without comment or citation.

## Discussion

The district court below denied Taylor's *pro se* petition for habeas relief, adopting the magistrate judge's report and recommendation without modification. We review the district court's denial of Taylor's habeas petition *de novo*. *Dows v. Wood*, 211 F.3d 480, 484 (9th Cir.2000).

---

1. The record does not disclose where Taylor's mother was at this time, nor what efforts, if any, were made to locate her.

2. A day after the suppression hearing, Remine testified at Taylor's trial that he had thrown away his notes of the interrogation. Thus, it appears likely that he had already gotten rid of them prior to the suppression hearing. In any event, the notes were never consulted on the record nor introduced into evidence.

3. Responding to our request for the tape-recording of Taylor's confession, the state advised that all trial exhibits, including the tape, had been destroyed on June 16, 1999, and that the Los Angeles County District Attorney's office does not possess any copies of the recording. Letter from Deborah J. Chuang, Deputy Attorney General, to Office of the Clerk, U.S. Court of Appeals 1 (Sept. 4, 2003).

1. At all stages in the state-court proceedings, Taylor challenged the admissibility of his confession on the grounds that it was coerced and obtained in violation of *Miranda* and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because the detectives who interviewed him did not cease their questioning after he asked to speak to an attorney. As part and parcel of these claims, Taylor consistently challenged the state trial court's findings that the detectives did not engage in misconduct and that he did not invoke his right to counsel. *See* Appellant's Opening Br. at 29 n. 8, *People v. Taylor,* No. B091340 (Cal.Ct.App. Dec. 6, 1996); Petition for Review at 14, *People v. Taylor,* No. B091340 (Cal. Jan. 14, 1997). Taylor therefore presented these issues to the state courts and properly exhausted his claims. *See* 28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese,* —— U.S. ——, 124 S.Ct. 1347, 1351, 158 L.Ed.2d 64 (2004) ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief ... by citing in conjunction with the claim the federal source of law on which he relies....").

Taylor also preserved these claims by raising them in his *pro se* federal habeas petition before the district court, and in his *pro se* petition for a certificate of appealability before us. *See* Request for the Issuance of a Certificate of Appealability at 3 ("I respectfully submit here that it was the very failure of the District Court ... to conduct a proper review of my *Miranda* claims that warrants relief here as I plainly argued that their resolution revolved around the purely factual question of what happened during the police interrogation...."). We granted a certificate of appealability as to "whether appellant's

*Miranda* rights were violated, and whether his confession was involuntary." Certificate of Appealability at 1.

2. Taylor's state-court lawyer moved to suppress his inculpatory statements and, the day before trial commenced, Judge Charles Sheldon of the Superior Court of Los Angeles County held an evidentiary hearing pursuant to section 402 of the California Evidence Code.[4] Taylor testified that he repeatedly asked for a lawyer, but the detectives denied his requests and engaged in threatening behavior. Detective Remine, who also testified, denied these allegations. Immediately after hearing all testimony and closing arguments, the court denied the suppression motion from the bench:

I am a fact finder first, and I have to decide and say who I believe. I conclude, in this case, that I clearly believe, beyond a reasonable doubt, Officer Ramine [sic] and not the testimony of the defendant in this case. Not only because it is the defendant in this case, but for other reasons, which were the nature of the facts that were developed by both sides. Leading me, in addition, to my feelings about who I should believe and who I really do believe, but also, why I should believe as a secondary or perhaps a primary, to look at with that crediting Officer Ramine's [sic] testimony. It now sheds light upon the decision.

[Defense counsel] makes the best case, of course, it is made primarily by the testimony of a witness I do not credit in this case. I find there was no violation of Miranda, the Miranda rights were given ahead of time, when they have been given before incriminating statements were given. I find it is voluntary under the case law, that has de-

---

4. Section 402 provides in relevant part: "[I]n a criminal action, the court shall hear and determine the question of admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests." Cal. Evid.Code § 402(b).

veloped on this whole issue, hundreds and hundreds of cases, actually, on this issue just like search and seizure, so I find it is both not a violation of Miranda, voluntary, I decline to suppress the statements that were given by the defendant to the officers in this case.

R.T. at 70–71.

After summarizing Taylor's and Remine's testimony, the court of appeal affirmed in an unpublished opinion, saying only that "[t]he evidence found credible by the trial court supports the determination that the waiver and confession were voluntary." Ct.App. Opin. at 10.[5] While the trial court's ruling was not a model of clarity, we construe it as finding that Taylor did not request counsel or his mother, that he confessed voluntarily and that the detectives behaved properly.

■ Principles of comity and federalism counsel against substituting our judgment for that of the state courts, a deference that is embodied in the requirements of the federal habeas statute, as amended by AEDPA. When it comes to state-court factual findings, AEDPA has two separate provisions. First, section 2254(d)(2) authorizes federal courts to grant habeas relief in cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Or, to put it conversely, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable. Cf. Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("The 'unreasonable applica-tion' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable."); see also Torres v. Prunty, 223 F.3d 1103, 1107–08 (9th Cir. 2000) (same standard of unreasonableness applies under subsections (d)(1) and (d)(2)). Second, section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that this presumption of correctness may be rebutted only by "clear and convincing evidence."

■ We interpret these provisions sensibly, faithful to their text and consistent with the maxim that we must construe statutory language so as to avoid contradiction or redundancy. The first provision—the "unreasonable determination" clause—applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence, see, e.g., Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 2538–39, 156 L.Ed.2d 471 (2003); Ward v. Sternes, 334 F.3d 696, 705–08 (7th Cir. 2003), that the process employed by the state court is defective, see, e.g., Nunes v. Mueller, 350 F.3d 1045, 1055–56 (9th Cir. 2003); Valdez v. Cockrell, 274 F.3d 941, 961–68 (5th Cir.2001) (Dennis, J., dissenting), or that no finding was made by the state court at all, see, e.g., Weaver v. Thompson, 197 F.3d 359, 363 (9th Cir. 1999); cf. Wiggins, 123 S.Ct. at 2539–41. What the "unreasonable determination" clause teaches us is that, in conducting this kind of intrinsic review of a state court's

---

**5.** We analyze the court of appeal's decision as the relevant state-court determination because the state supreme court denied Taylor's petition for review without citation or comment. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir.2000). However, because the court of appeal adopted the reasoning of the trial court, we also discuss the trial court's decision. Lewis v. Lewis, 321 F.3d 824, 829 (9th Cir.2003).

processes, we must be particularly deferential to our state-court colleagues. For example, in concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record. *Cf. Lockyer,* 538 U.S. at 75, 123 S.Ct. 1166. Similarly, before we can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.

 Once the state court's fact-finding process survives this intrinsic review— or in those cases where petitioner does not raise an intrinsic challenge to the facts as found by the state court—the state court's findings are dressed in a presumption of correctness, which then helps steel them against any challenge based on extrinsic evidence, *i.e.,* evidence presented for the first time in federal court. AEDPA spells out what this presumption means: State-court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error. *See* 28 U.S.C. § 2254(e)(1). Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the "unreasonable determination" standard of section 2254(d)(2).

Petitioner here did not present any evidence in federal court. Instead, the district court rejected petitioner's claim at the initial, or intrinsic, stage of the review process. The appeal before us is therefore governed by the "unreasonable determination" standard of section 2254(d)(2). What we must determine is whether petitioner's conviction "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." This is a daunting standard— one that will be satisfied in relatively few cases. Nevertheless, the standard is not impossible to meet; as the Supreme Court pointed out in *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), "Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable." *Id.* at 340, 123 S.Ct. 1029. Indeed, the Supreme Court, our court and other circuits have all found the standard met. *See Wiggins,* 123 S.Ct. at 2538–39; *Norton v. Spencer,* 351 F.3d 1, 6–8 (1st Cir.2003); *Ward,* 334 F.3d at 705; *Nunes,* 350 F.3d at 1056; *Hall v. Dir. of Corrections,* 343 F.3d 976, 983 (9th Cir.2003); *Bui v. Haley,* 321 F.3d 1304, 1315 (11th Cir.2003); *Miller v. Dormire,* 310 F.3d 600, 603–04 (8th Cir. 2002); *Bradley v. Duncan,* 315 F.3d 1091, 1096 (9th Cir.2002); *Paxton v. Ward,* 199 F.3d 1197, 1210 (10th Cir.1999).

 As noted, intrinsic challenges to state-court findings pursuant to the "unreasonable determination" standard come in several flavors, each presenting its own peculiar set of considerations. No doubt the simplest is the situation where the state court should have made a finding of fact but neglected to do so. In that situation, the state-court factual determination is perforce unreasonable and there is nothing to which the presumption of correct-

ness can attach. *See, e.g., Wiggins,* 123 S.Ct. at 2539–40; *Killian v. Poole,* 282 F.3d 1204, 1208 (9th Cir.2002); *Weaver,* 197 F.3d at 363; *Nunes,* 350 F.3d at 1055. A somewhat different set of considerations applies where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard. *See, e.g., Caliendo v. Warden,* 2004 WL 720362, at *6 (9th Cir. Apr.5, 2004); *Fernandez v. Roe,* 286 F.3d 1073, 1077 (9th Cir.2002); *Wade v. Terhune,* 202 F.3d 1190, 1197 (9th Cir.2000). Obviously, where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it.

■ Closely related to cases where the state courts make factual findings infected by substantive legal error are those where the fact-finding process itself is defective. If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an "unreasonable determination" of the facts. *See, e.g., Weaver,* 197 F.3d at 363; *Nunes,* 350 F.3d at 1055; *cf. Bryan v. Mullin,* 335 F.3d 1207, 1215–16 (10th Cir.2003) (declining to apply presumption where state court failed to hold an evidentiary hearing). *But see Valdez,* 274 F.3d at 948–50 (sections 2254(d)(2) and (e)(1) apply despite defects in the state-court hearing). Similarly, where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable. *See, e.g., Wiggins,* 123 S.Ct. at 2538–39; *Hall,* 343 F.3d at 983. And, as the Supreme Court noted in *Miller–El,* the state-court fact-finding process is undermined where the state court has before it,

yet apparently ignores, evidence that supports petitioner's claim. *Miller–El,* 537 U.S. at 346, 123 S.Ct. 1029 ("Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony demonstrating that the Dallas County District Attorney's Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past."); *accord Collins v. Rice,* 365 F.3d 667, 685 (9th Cir.2004).

■ Petitioner here claims the latter kind of defect in the state-court fact-finding process—failure to consider and weigh relevant evidence that was properly presented to the state courts and made part of the state-court record. In considering this kind of claim, we are mindful that the state courts are not required to address every jot and tittle of proof suggested to them, nor need they "make detailed findings addressing all the evidence before [them]." *Miller–El,* 537 U.S. at 347, 123 S.Ct. 1029. To fatally undermine the state fact-finding process, and render the resulting finding unreasonable, the overlooked or ignored evidence must be highly probative and central to petitioner's claim. In other words, the evidence in question must be sufficient to support petitioner's claim when considered in the context of the full record bearing on the issue presented in the habeas petition. We therefore proceed by reciting the evidence presented at Taylor's suppression hearing.

3. In his testimony at the suppression hearing, Taylor gave a disturbing account of his interrogation. He recalled that he awoke to find a flashlight and a gun pointed at him, and his living room filled with men. As he was handcuffed and placed in a police car, he was not told why he was being arrested. Taylor asked the officer driving the car if he knew the reason for

the arrest. The officer said Taylor would be told at the station. Taylor also asked the officer if he "could call ... [his] mom when ... [he] got there. [The officer] ... said that she would be notified for ... [him]." R.T. at 32.

Once at the station, Taylor recounted, he was taken on an elevator to an upper floor, where he waited alone in a small interrogation room for about thirty minutes. When Remine and MacLyman arrived, they did not tell him immediately why he had been arrested, asserting instead that he knew why he was there. MacLyman—who Taylor described as "the bigger fellow"—wore a ring inscribed with the police code for murder, "187," which he thrust in Taylor's face, saying, " 'Well, you know why you're down here.' " *Id.* at 34. MacLyman then told Taylor he had been arrested in connection with Shadden's killing.

▆▆▆ During the questioning that followed, Taylor asked several times to speak to his mother [6] and an attorney named Arthur Close. Taylor was adamant in his assertions at the suppression hearing that he had requested counsel before incriminating himself. For example:

> Q: ... [D]id you ask to speak to anyone?
>
> A: I asked to speak with my attorney. I told ... [the detectives] I knew an attorney from the outs. I thought maybe I could call him to get some advice, and they told me no, it wouldn't be possible.

Q: Did you ask to speak with anyone else?

A: I then asked, "Well, can I speak with my mother, can I call her?" And they told me, no.

*Id.* at 35–36. Similarly:

Q: ... Did you ask to speak to a lawyer?

A: Yes.

Q: And did you ask to speak to a specific lawyer?

A: Yes, I did.

Q: Did you have the telephone number of a lawyer to call?

A: Yes, I did.

Q: And do you remember that telephone number now?

A: I do.

Q: What telephone number is that?

A: Area code 310, 599–6448.

. . . .

Q: ... Did you want to talk to these detectives?

A: No, I didn't.

Q: Did you want to talk to Art Close before you talked to the detective?

A: Yes.

Q: Did you try to do that?

A: Yes.

Q: Did somebody prevent you from doing that?

A: Yes.

---

**6.** Under California law, a minor subject to custodial interrogation invokes the Fifth Amendment by asking to see a parent. *See People v. Burton,* 6 Cal.3d 375, 383–84, 99 Cal.Rptr. 1, 491 P.2d 793 (1971). Upon such a request, before or during questioning, "[t]he police must cease custodial interrogation immediately." *Id.* at 384, 99 Cal.Rptr. 1, 491 P.2d 793. While state law cannot provide the basis for federal habeas relief, *see Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), state law may supply the means for asserting federal rights. For example, if state law provides that a minor who asks for his parent thereby invokes his federal right to remain silent, we may well deem the right invoked upon the utterance of such a request. Because petitioner here claims he asked for a lawyer, nothing hinges on his also having asked for his mother. We therefore need not resolve the issue and leave it for another day.

Q: Who did that?

A: One of the detectives, I can't remember.

Q: How did they prevent you?

A: They told me it wouldn't be possible. They told me just, you know, they wanted me to tell them what they wanted to hear. They told me just to tell them what happened, and they would let me use the phone.

*Id.* at 40–43. And again:

Q: [After some questioning had elapsed], did you still want to speak to your lawyer or a lawyer?

A: Several times, I mentioned to speak to him.

*Id.* at 46. And on cross-examination by the prosecution:

Q: [The detectives] . . . told you you couldn't have an attorney?

A: They didn't tell me I couldn't have one. They told me I couldn't make a phone call to one.

Q: You said "I want to call an attorney?"

A: Yes.

Q: . . . You didn't say, you want to call Art?

A: I said I want to call an attorney, and they said who, . . . .

*Id.* at 56. In these and other exchanges, Taylor never wavered in his assertion that he wanted to call a lawyer during his interrogation and asked for access to a phone in order to do so.

According to Taylor, the detectives denied his requests. Instead, MacLyman drew long and short lines on a piece of paper, explaining to Taylor that he could go to jail for the rest of his life (long line) or just until he was twenty-five (short line), depending on whether he cooperated with the detectives. MacLyman also coaxed Taylor, saying he knew Taylor didn't kill Shadden deliberately but had done so unintentionally. Although Taylor

steadfastly denied involvement, the detectives persisted in the questioning and would not permit Taylor to make a phone call until he told them "the truth."

Taylor became desperate and upset. Concluding that he could clear up the matter later, Taylor decided to yield to the detectives' insistent demands that he confess in order to gain access to a phone. He then made the eleven-minute recording memorializing his *Miranda* waiver and confession. Explaining why he would give a false confession, Taylor said,

I am getting tired, so I just started agreeing with everything so I can get out and make a phone call, because I was thinking, you know, *well I didn't do it anyways*, so why don't I just try to get out of the room to get my phone call and just tell them what they want to hear.

*Id.* at 46–47 (emphasis added). He reiterated,

I was just tired, you know. I wanted to get out of that room, for one thing. I was thinking, you know, you know, I am just not knowing what was going on. I am thinking these guys are supposed to be the good guys. I was never involved in any serious crime, so if I just agree with them, get my phone call, I will get it straightened out, I will go home.

*Id.* at 47.

Taylor recalled that, at some point, he was given a form advising him of his *Miranda* rights and signed it to indicate his waiver of those rights. His testimony was unclear as to whether he signed the advisement form before or after he initially inculpated himself, but he asserted he was not shown the form and did not sign it until well after the bulk of the interrogation was concluded. Taylor also claimed he was so upset that he didn't pay attention to the advisement and merely signed the form as instructed. In response to

questioning by defense counsel, Taylor explained that the detectives made it hard for him to read the form:

Q: Did you read that document before you signed it?

A: No, I didn't.

Q: Did anybody read it to you?

A: Not that I can recall.

Q: Why didn't you read it, were you given—why didn't you read it?

A: I didn't read it. I wasn't allowed to read it. It was just "sign here" and their hand stayed on the paper.

MR. SCHMOCKER: Your honor, may the record reflect that the witness turned the paper around as if showing it to somebody else.

THE COURT: All right. And he had his hand over part of the upper part of the paper.

Q by MR. SCHMOCKER: Was there a hand over a part of that upper part of that paper?

A: Yes, sir[,] there was.

*Id.* at 38–39.

MacLyman, the bête noire in Taylor's account of these events, did not testify at the suppression hearing. Remine, who did testify, related a story very different from Taylor's—or, at least, professed to lack specific recollection on key points in Taylor's story. Remine asserted that Taylor had been advised of his *Miranda* rights immediately after Remine and MacLyman joined him in the interrogation room, and that he had waived his rights at that time by signing the advisement form. Remine did confirm that MacLyman wore a "187" ring and that the interrogation room was on an upper floor in the police station. He denied or could not recall that Taylor appeared emotional during questioning, that Taylor asked to speak with his mother, that MacLyman thrust his "187" ring in Taylor's face, and that MacLyman mapped lines representing potential sentences. Remine also denied that he told Taylor he knew Taylor hadn't intended to kill the victim; he was never asked whether MacLyman made that statement. When asked by defense counsel whether Taylor asked to speak with Close, Remine replied, "I don't recall him making that statement." *Id.* at 17.

Asked by defense counsel if Taylor requested a lawyer *prior* to signing the advisement form, Remine unqualifiedly stated, "No, sir." *Id.* at 21. But when defense counsel asked whether Taylor asked for a lawyer *after* signing the form, Remine ambiguously replied, "Not to my recollection, he did not," *id.*, and to counsel's repeated inquiry whether Taylor ever asked to speak with a lawyer named Close, Remine hedged, "I don't recall him saying that, no, sir," *id.* Remine also denied that Taylor had asked for his mother before questioning and could not recall whether he had asked for his mother during questioning. The prosecutor did not seek to clarify the ambiguities in Remine's testimony, and never asked Remine if Taylor had asked to speak with counsel at any point.

In evaluating the relative credibility of these two sharply differing accounts of the events inside the interrogation room, the state courts treated this as a swearing-contest between Taylor and Remine. The state trial judge simply said that he believed Remine, not Taylor. He purported to give reasons for disbelieving Taylor's account of the interrogation, but his explanation defies rational understanding:

Not only because it is the defendant in this case, but for other reasons, which were the nature of the facts that were developed by both sides. Leading me, in addition, to my feelings about who I should believe and who I really do believe, but also, why I should believe as a secondary or perhaps a primary, to look at with that crediting Officer Ramine's

[sic] testimony. It now sheds light upon the decision.

*Id.* at 70–71.[7]

The court of appeal found that Remine's testimony constituted a sufficient basis in the record for the trial court's findings, and therefore affirmed. Remarkably, neither the state trial court nor the state appellate court acknowledged that another witness testified at the suppression hearing—attorney Arthur Close, who said he received a telephone call from Taylor in the early morning hours of September 2, 1993, shortly after Taylor had given his confession. As detailed below, Close's testimony strongly corroborates Taylor's account of the interrogation and stands entirely unrefuted. Neither the state trial court nor the state appellate court found that Close had fabricated his testimony, nor was there any basis in the record for such a finding. The state courts simply ignored Close. For the reasons explained at length below, the state courts' failure to consider, or even acknowledge, Close's highly probative testimony casts serious doubt on the state-court fact-finding process and compels the conclusion that the state-court decisions were based on an unreasonable determination of the facts.

4. Close testified that Taylor had called him at home, at "approximately four a.m." on September 2. *Id.* at 58. Taylor told Close that he had just confessed to murder, that he had requested his mother and Close more than once, that he had been prevented from making a phone call until after he confessed, that he had confessed falsely in order to gain permission to make that phone call, and that one of the two detectives questioning Taylor had thrust a "187" ring in his face, and had drawn a diagram to illustrate the alternatives facing Taylor depending on whether or not he cooperated by confessing.[8] Close explained that Taylor did not tell him the exact significance of the diagrammed alternatives, only what had transpired. In all of these respects, Close substantially corroborated Taylor's story. But Close's testimony also went beyond the scope of Taylor's, for Close testified that "[Taylor] said he requested, by name, to speak to me on the elevator in the police department, prior to the questioning." *Id.* at 62. Close further testified that Taylor was crying and upset during the call and that Taylor provided these details without prompting from Close.

The state trial judge said nothing at all about Close's testimony. In reviewing the trial court's ruling at the suppression hearing, the court of appeal similarly failed to mention Close's testimony or to consider its remarkable congruence with Taylor's account of what had transpired during his interrogation. The court of appeal only passingly discussed Close's testimony in upholding its exclusion *at trial* under section 1250 of the California Evidence Code. In describing Close's testimony as to that issue, the court of appeal noted that Close

---

7. We would normally attribute incoherence in the trial court's explanation to mistakes in the transcribing process. However, we have carefully read the record and have found no unusual problems with the transcript of the suppression hearing. Everyone else who spoke is perfectly understandable. Nor is the passage quoted in text the only one in the judge's ruling that is less than pellucid. Just two sentences later, we also find this muddled passage:

> I find it is voluntary under the case law, that has developed on this whole issue, hundreds and hundreds of cases, actually, on this issue just like search and seizure, so I find it is both not a violation of Miranda, voluntary, I decline to suppress the statements that were given by the defendant to the officers in this case.

R.T. at 71.

8. Because we deem Close's testimony central to the resolution of this case, we reproduce it in full in the appendix.

said Taylor " 'was in tears and highly agitated' " during the phone call early on September 2. Ct.App. Opin. at 7. The court of appeal also quoted defense counsel's proffer at trial: " '[H]e received a call from [defendant] about four a.m. and ... [defendant], at that time, said that he had given a false confession to a cop in order to make a phone call to Mr. Close in his capacity as a lawyer.' " *Id.* Thus, the court of appeal was aware of Close's testimony, yet never considered or even acknowledged that it corroborated particularly unusual details in Taylor's story: that Taylor rode an elevator to the floor where the interrogation room was located (at which time he allegedly asked for counsel), that Taylor asked for his mother, that one of the detectives wore a ring inscribed with a "187" and brandished the ring in Taylor's face, and that the detective with the ring "mapped" out Taylor's possible fate by drawing "a diagram of two different routes of what would happen to him. One route if he cooperated and confessed, the other route that if he refused to do so, and what the consequences would be." R.T. at 61. Nor did the court of appeal consider that Close testified that Taylor had told Close his requests for counsel and his mother had been denied. In other words, the court of appeal, like the state trial court, ignored the detailed quality of Close's testimony and the fact that it matched Taylor's account of the events inside the interrogation room.

While Close's testimony is based on what Taylor told him during their telephone conversation following the end of

the interrogation, it nevertheless corroborates Taylor's account in important respects.[9] To begin with, the record discloses that Taylor called Close at the first available opportunity. Taylor's taped confession ended at 3:13 a.m., and he was thereafter booked—a process that was completed no earlier than 3:55 a.m.[10] Close testified that he received Taylor's call at approximately 4:00 a.m. This confirms Taylor's claim that he wanted to get in touch with Close at the first available opportunity. Moreover, Taylor's call also confirms his claim that he could, in fact, get in touch with a lawyer, even in the middle of the night: He knew Close's home phone number and felt comfortable waking him. Perhaps most important, the details of Taylor's story, as related to Close during their telephone conversation, precisely matched Taylor's testimony at the suppression hearing, precluding the possibility that Taylor had fabricated those details during the eleven months between his confession and the hearing. Finally, Close testified that, during the telephone conversation, Taylor was "in tears and highly agitated." *Id.* at 60. This contradicts Remine's account that Taylor was calm during questioning and confirms Taylor's account of the interrogation as a coercive ordeal.

While Close's testimony is perhaps not conclusive, it is certainly highly probative. A rational fact-finder might discount it or, conceivably, find it incredible, but no rational fact-finder would simply ignore it. Yet this is precisely what the state courts

---

**9.** It is unclear whether, under California law, hearsay is admissible at a suppression hearing irrespective of whether it falls within an exception. *See People v. Johnson,* 3 Cal.Rptr.3d 507, 522–23 (Ct.App.2003), *rev. granted & opinion superseded by* 6 Cal.Rptr.3d 421, 79 P.3d 539 (2003). In any event, Close's testimony was admitted without a hearsay objection.

**10.** After the interview ended at 3:13 a.m., Ct.App. Opin. at 5, the record indicates that Taylor went through booking procedures. It is unclear how long the procedures took, but MacLyman testified at the preliminary hearing that Taylor was logged as booked at 3:55 a.m. R.T. of Prelim. Hearing at 18.

did in Taylor's case. At the end of the suppression hearing, the state trial court, in a ruling that is difficult to follow, *see* pages 998–999, 1004–1005 & note 7 *supra,* found Remine credible and Taylor incredible, and that was that. The court said nothing at all about Close, not 'even so much as to acknowledge that he had testified just minutes earlier. The state appellate court was similarly laconic, utterly failing to discuss the significance, or even the existence, of Close as a witness at the suppression hearing, even though the importance of his testimony was vigorously argued in Taylor's brief.[11] A decision on which turns whether a teenager will spend the rest of his days behind bars merits closer judicial attention from the state courts.

In instructing jurors about their fact-finding function, we normally advise them to consider the entire record, not individual pieces of evidence standing alone. *See United States v. Bertoli,* 40 F.3d 1384, 1401 (3d Cir.1994); *United States v. Betancourt,* 838 F.2d 168, 175 (6th Cir.1988); *United States v. Minyard,* 461 F.2d 931, 934 (9th Cir.1972); *Kearney v. Bell,* 160 Cal. 661, 668–69, 117 P. 925 (1911); *Breuner Co. v. Allred,* 98 Cal.App. 92, 96, 276 P. 422 (Ct.App.1929); *see, e.g.,* CALJIC 2.50.2 ("You should consider all of the evidence bearing upon every issue ...."); CALJIC 8.84.1 ("Both the People and the defendant have a right to expect that you will consider all of the evidence ...."). This reflects the philosophy of our common-law fact-finding process, namely, that the various pieces of evidence and testimony in the record must be considered in light of all the others. Testimony may seem implausible standing alone, yet gain considerable force when confirmed in a material respect by an independent source or by an objectively verifiable fact. Similarly, testimony may seem highly plausible, yet be discredited when it is shown to be irreconcilably ·in conflict with other evidence. Fact-finding is thus a dynamic, holistic process that presupposes for its legitimacy that the trier of fact will take into account the entire record before it.

■ What goes for juries goes no less for judges. In making findings, a judge must acknowledge significant portions of the record, particularly where they are inconsistent with the judge's findings. The process of explaining and reconciling seemingly inconsistent parts of the record lays bare the judicial thinking process, enabling a reviewing court to judge the rationality of the fact-finder's reasoning. On

---

**11.** Taylor summarized Close's testimony as follows:

*Testimony of Attorney Close.*

Attorney Arthur Close testified that at approximately 4 a.m. on September 2, 1993, he got a telephone call from appellant. Close knew appellant from a community graffiti cleanup program, and because appellant had done chores for Close and his neighbors.

Appellant was in tears and highly agitated. Appellant told Close that he had just confessed to committing a murder, because he had been interrogated for four hours and was not able to make a telephone call until he did. Appellant stated that he had asked at least four times to have his lawyer present, and had also asked to have his mother present, but had been denied permission to do so.

Appellant stated that, during the interrogation, one of the officers kept pushing a diamond ring with the number "187" in his face, and that he drew a diagram of two different routes of what would happen to him. One route depicted what would happen to appellant if he cooperated and confessed, and the other route depicted what the consequences would be if he refused to do so.

Appellant was adamant that he did not commit the murder and stated that the only reason he confessed was because he wanted to telephone his lawyer and mother. Close advised appellant not to make any more statements to the police without an attorney.

App. Opening Br. before Cal. Ct.App. at 12–13 (citations to record omitted).

occasion, an effort to explain what turns out to be unexplainable will cause the finder of fact to change his mind. By contrast, failure to take into account and reconcile key parts of the record casts doubt on the process by which the finding was reached, and hence on the correctness of the finding. *See, e.g., Gui v. INS,* 280 F.3d 1217, 1228 (9th Cir.2002) (failure of immigration judge to support adverse credibility finding with specific, cogent reasons constitutes grounds for reversal); *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir.1988) (failure of ALJ to give specific reasons for ignoring treating physician's opinion constitutes grounds for reversal).

As noted, neither the state trial court nor the state appellate court so much as mentioned Close's testimony in ruling on the admission of Taylor's confession, much less discussed what light this testimony cast on the striking differences in the descriptions of the interrogation given by Taylor and Remine. This was a major omission. Close was not a random witness testifying to a collateral detail. Rather, he was the very lawyer that Taylor claims he had asked for during his interrogation. As discussed at greater length below, the very fact that Taylor made the call to the lawyer immediately upon being given access to a phone, and that the story he told Close (as recounted in Close's testimony) was consistent with Taylor's own testimony as to significant and unusual details, makes Close's testimony highly probative. Moreover, Close knew Taylor and expressed a view as to how Taylor sounded during the phone call—a description that backed up Taylor's account of events and undermined Remine's. The state courts might have disbelieved Close, or perhaps discounted his testimony, but they were not entitled to act as if it didn't exist.

■■■ Failure to consider key aspects of the record is a defect in the fact-finding process. *Miller-El,* 537 U.S. at 346, 123 S.Ct. 1029; *Collins,* 348 F.3d at 1097. How serious the defect, of course, depends on what bearing the omitted evidence has on the record as a whole. Here, Close's testimony was very significant, as it provided the only glimpse into the events on the night of the interrogation by someone who was not one of the contending parties. It is not as good a look as we could have had, if the officers had taped the entire interview, or had permitted Taylor to have his mother or a lawyer present during questioning—or even if they had kept the notes of the interrogation. But it is much better evidence than we usually have because the phone call to Close "locked" Taylor's story soon after the interrogation ended and just minutes after Taylor was booked, and thereby foreclosed the opportunity for Taylor to embellish or fabricate after reflection or based on advice he got from friends, relatives or fellow inmates. By making their findings without taking Close's testimony into account, the state courts made an "unreasonable determination of the facts." In passing section 2254(d)(2), Congress has reminded us that we may no more uphold such a factual determination than we may set aside reasonable state-court fact-finding. When we determine that state-court fact-finding is unreasonable, therefore, we have an obligation to set those findings aside and, if necessary, make new findings.

■■■ The question remains whether we should make those findings ourselves, or remand for the district court to make them in the first instance. If petitioner were seeking to introduce new evidence in support of his view of the facts, we would have no choice but to remand. But petitioner is not seeking to introduce new evidence; he merely asks us to make findings as to what happened during his interrogation, based on evidence presented to the state courts. In such circumstances, we are in no worse

a position than the district court to make the findings. *See, e.g., Wiggins,* 123 S.Ct. at 2539–41. And making the findings ourselves serves the interest of judicial economy because it obviates the need for a possible appeal (by one side or the other) from the district court's ruling. It also serves the interest of justice because, were we to find in favor of petitioner, we would then be able to determine the relief to which he is entitled. Given that petitioner has already served over ten years of his sentence, we see no reason for further delay and proceed to find the facts ourselves.

 5. Because Remine and Taylor gave contradictory accounts of what transpired inside the interrogation room, we start by considering what weight to give Close's testimony. We note that Close's testimony satisfies the customary criteria of reliability: It is direct and precise, internally consistent and plausible. *See Anderson v. City of Bessemer,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *see also Spain v. Rushen,* 883 F.2d 712, 719 (9th Cir.1989). Close did not back-track or equivocate; he did not claim a failure of memory. As a lawyer, Close was doubtless acutely aware of his duty to speak candidly, and of the criminal and professional consequences of failure to do so. Moreover, Close told Taylor that he (Close) would likely be called upon to testify about their conversation; he was thus aware of the need to commit the details of the conversation to memory. His testimo-

ny was also confirmed as to two significant details. Close said that one of the officers wore a ring with "187" inscribed on it, as Detective Remine also testified. Further, Detective Remine testified that the interrogation room was on the third floor, thus indirectly confirming Close's testimony that Taylor rode an elevator at the police station. Other details, such as the timing of the call, are consistent with the record. *See* page 1006 & note 10 *supra.* If Close's testimony is to be disbelieved or discounted, it would be on two possible grounds: Either Close committed perjury in coordination with Taylor, or Taylor lied, not only at the suppression hearing, but also when he called the attorney.

There is nothing in the record to suggest that Close would put his license to practice law on the line by perjuring himself in order to support Taylor's story. *Cf. Norton,* 351 F.3d at 7 (refusing to infer a no-credibility finding where, among other things, there was no evidence in the record impugning the credibility of the affiants). From what we know of Close and Taylor, the two did not have the kind of personal relationship that might have motivated Close to lie.[12] The prosecution did not attempt to impugn Close's credibility; its entire cross-examination consisted of one question:

> [PROSECUTION]: Mr. Close, I am not quite clear, did [Taylor] tell you "I lied to the police and confessed to them," or did he tell you "I confessed?"

---

**12.** In response to defense counsel's questions, Taylor explained how he knew Close and had learned Close's phone number by heart:

> Q: How did you come to have ... [Close's] telephone number in your possession, that telephone number of Art?
> A: There was several times I did yard work around his house, and he used to have a lot of minors go around painting the neighborhood, painting the graffiti, painting over it. And he gave me his card one day,

and told me if I ever needed it, to give him a call.
> Q: And you had that, did you have that card with you on September, the early morning hours of September second?
> A: No, I didn't.
> Q: How did you know his phone number?
> A: I had his phone number memorized because I have called him several times asking if he needed work done.
> R.T. at 41–42.

[CLOSE]: No, he adamantly insisted that he didn't do it, but the only reason he confessed was because he was desirous of making a phone call to his lawyer and his mother. He said that was the reason for the confession.

[PROSECUTION]: No further questions, your Honor.

R.T. at 63. Neither the state trial court nor the court of appeal found that Close had lied at the suppression hearing, and we find no basis for doing so.

Nor do we find plausible the alternative theory for discrediting Close's testimony, namely, that Taylor had fabricated the story of the false confession out of whole cloth by the time he called Close. The record reveals that Taylor has only a low-average IQ. *See* page 1017 *infra*. We think it highly improbable that a sixteen-year-old boy, of limited mental acuity and with a minimal police record, *see* page 1015 *infra*, had the wherewithal to concoct a tale of police intimidation, filled with graphic details, in the short span between the end of his interrogation and his phone call to Close. Taylor was a teenager without parent, attorney or friend, taken from his home at gunpoint in the dead of night and then questioned at length by two police officers, and thus was particularly vulnerable to the inherently coercive environment in which he found himself. *Cf. Haley v. Ohio*, 332 U.S. 596, 600–01, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (finding involuntary the confession of a fifteen-year-old questioned without an attorney for five hours beginning at midnight). Close, who knew Taylor well, clearly believed the boy was telling the truth.

Further, that Taylor called Close immediately after being given access to a phone means that he had little time in which to fabricate a story with the specific, peculiar details he related, such as the fact that he asked for a lawyer and his mother, that a detective thrust a "187" ring in his face or

that the same detective mapped out Taylor's potential fate on a sheet of paper. Moreover, Close's recollection that Taylor was "in tears and highly agitated," R.T. at 60, underscores how remote a possibility it is that Taylor had the time or mental clarity to calmly fabricate his tale before calling Close. Finally, the story Taylor told Close on September 2, 1993, was in all material respects the same story he told at the suppression hearing on August 17, 1994.

We find it highly plausible that a frightened teenager would ask to speak with a lawyer he knew—or any lawyer—yet, when he is repeatedly denied the right to do so, would eventually give up hope, sign a waiver form and simply give the two adult authorities who stood between him and a phone call what they insisted on. That scenario is far more plausible than the prospect of a boy *not* asking for an attorney throughout his questioning—an attorney whose home phone number he knew by heart—confessing to murder, and then rushing to a phone to call the attorney, concocting an elaborate tale of police misconduct and feigning tears and agitation.

 Remine's ambiguous assertions at the suppression hearing that he could not recall whether Taylor had requested counsel during questioning do not adequately contradict Taylor's and Close's testimony on this point. Moreover, even were we to construe Remine's ambiguous responses as affirmative denials that Taylor requested counsel, we would still credit Taylor's claims that he asked for an attorney, as corroborated by Close's virtually unquestioned testimony, over Remine's testimony.

We need not find that Remine perjured himself, although there is ample basis in the record for doing so—such as his repeated invocation of equivocal phrases such as "I don't recall" and "Not to my recollection." Rather, we can attribute

Remine's watery testimony to the fallibility of human memory and to inherent limitations on Remine's observations in the early morning hours of September 2. *See Wiggins,* 123 S.Ct. at 2541 ("We are not accusing ... [petitioner's lawyer] of lying."). Remine's recollection of the events of September 2 was less than flawless. For example, Remine initially testified that "[m]yself and Detective MacLyman" transported Taylor from his residence to the police station. R.T. at 11. When defense counsel pressed Remine on whether he had "a specific recollection of transporting him yourself?", Remine replied, *"I am almost positive* that's what happened." *Id.* (emphasis added). However, upon checking the record of transportation noted on Taylor's booking slip, Remine was forced to concede, "My mistake, Detective Dugan transported him." *Id.*

Remine was similarly unclear about the manner in which he and/or MacLyman advised Taylor of his *Miranda* rights. Inquiring about the procedure used to advise Taylor of his rights, defense counsel asked, "In this case did Mr. Taylor read it to himself, or did you read it to him?" *Id.* at 20. Remine replied, *"I don't recall which way it was.* I will say that we turned [it] around, and we read it to him. We turned it around and let him read it, and we read it to him while he was reading it to himself." *Id.* (emphasis added). Defense counsel sought to clarify Remine's answer: "And do you have a specific recollection of doing that?" *Id.* Remine conceded, "No, sir[,] I do not." *Id.*

The prosecution subsequently asked Remine, "At the time that you presented [the legal advisement form] to Mr. Taylor, did you advise him of his rights?" *Id.* at 26. Remine hedged, "I think Detective MacLyman is the one that was going over the advisement with him." *Id.* The prosecution pressed, "But I want to make sure it is clear, in addition to having the rights presented to him in written form, were they *verbally* given to him?" *Id.* (emphasis added). Though he had previously stated that he could not remember whether Taylor was read his rights, Remine said unqualifiedly, "Yes, sir." *Id.* Such waffling on Remine's part is not entirely surprising, for he and MacLyman had interrogated Taylor on September 2, 1993, but Remine testified about those events nearly a year later on August 17, 1994. Remine had doubtless participated in other interrogations in the eleven months since he had questioned Taylor. Over time, and given intervening, unrelated events, Remine's memory could have faded or become confused.

Of course, recollections can be refreshed, *see* Cal. Evid.Code § 771; *cf. People v. Verodi,* 150 Cal.App.2d 137, 148–50, 309 P.2d 568 (Ct.App.1957) (proper for police officer to refresh his recollection of a conversation with defendant, using memorandum based on contemporaneous notes and dictated the day after the conversation), as was demonstrated when Remine consulted Taylor's booking slip and corrected his mistake about who transported Taylor to the police station. But it appears that Remine did not have his notes from the early morning interrogation to refresh his memory. *See* page 997 & note 2 *supra.* He did not refer to them during his testimony at the suppression hearing, and at trial the next day, Remine admitted that he had thrown away his notes—which in itself is odd.

In addition to the potential detrimental effect of time on his memory, Remine was also inherently limited as a witness because he was not present during all the events to which Taylor testified. Remine was not with Taylor during his transportation to the police station when Taylor asked if his mother would be contacted, and he was not with Taylor during Taylor's arrival at the station and elevator ride

to the third floor where the interrogation room was located.[13] Thus, Remine's one unambiguous denial to defense counsel that Taylor requested a lawyer—that Taylor did not ask for counsel *prior* to signing the advisement form at the start of questioning—does not contradict Close's testimony that Taylor asked to speak with Close while on the elevator. Further, although present for much of the interrogation, Remine was not with Taylor during the entire period of questioning. Remine explained in response to defense counsel questions that, while either he or MacLyman were with Taylor throughout the interrogation, there were times when one of them was absent:

> Q: And during this period of time, from 12 midnight until slightly after 3:00 o'clock, were both you and Detective MacLyman in the room with Mr. Taylor?
>
> A: One of us at all times, until the interview was concluded, and then I think we went and got the booking sheets and filled that out. But throughout the whole interview, one of us was with him at all times.

Q: At some periods of time, you would leave the room; is that correct?

A: Correct. Myself or Detective Mac-Lyman but one of us would always remain there.

R.T. at 16.

Thus, Remine could not contradict Taylor's and Close's testimony about events that may have transpired out of Remine's presence. His absences particularly undercut the value of his testimony because he was not the primary wrongdoer in the misconduct described by Taylor—MacLyman was. Thus, Remine's testimony, even if truthful, doesn't persuasively bear on whether MacLyman, in Remine's absence, may have denied Taylor access to a phone.[14]

These limitations on Remine's testimony are compounded by the fact that Remine was the *only* state witness at the suppression hearing. The prosecution could have filled the gaps in Remine's memory or ability to observe unfolding events by calling MacLyman to testify, or by calling the officer who transported Taylor and escorted him to the interrogation room. But it did not.[15] The detectives could have fully

---

**13.** Remine was either at Taylor's apartment executing the search warrant or was en route from there to the police station.

**14.** Taylor testified at the suppression hearing that "one of the detectives" would not allow him to call Close. R.T. at 43. He couldn't recall which one it was.

**15.** Juries may be instructed that failure of a party to bring forward a witness gives rise to the inference that the witness's testimony would have been unfavorable. *See* 1A Kevin F. O'Malley et al., Federal Jury Practice and Instructions § 14.15, at 337–38 (5th ed.2000) ("If it is peculiarly within the power of either the government or the defense to produce a witness who could give relevant testimony on an issue in the case, failure to call that witness may give rise to an inference that this testimony would have been unfavorable to that party."); *cf.* CALJIC 2.62 ("If you find

that the defendant failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence and as indicating that among the inferences that may reasonably be drawn there from those unfavorable to the defendant are the more probable."); *People v. Ford*, 45 Cal.3d 431, 442–47, 247 Cal.Rptr. 121, 754 P.2d 168 (1988). Similarly, it would be a fair inference here that the testimony of MacLyman and the officer who escorted Taylor would have been unfavorable to the state, since the state—despite the gaps in Remine's testimony—did not call either as a witness. We need not rely on this inference, however; it suffices that Remine's testimony does not adequately refute Taylor's and Close's.

documented the interrogation by taping it in its entirety or preserving notes of the session. But they did not. Thus, we are compelled to weigh Remine's inherently incomplete and somewhat confused testimony against Taylor's precise account of police misconduct, an account that remained consistent over the course of about a year, and Close's highly corroborative testimony.

Of course, our concerns with Remine's testimony cannot provide the basis for a conclusion that there is clear and convincing evidence in the record of police misconduct.[16] But the confusion Remine evinced in his recollection of September 2 and the fact that he was not present during all of the events in question inherently limit the extent to which his testimony can contradict—and thereby rebut—Taylor's and Close's accounts. As noted, Close's testimony suffered none of the shortcomings of Remine's. *See* pages 1010–1012 *supra.* We have also closely examined Taylor's testimony at the suppression hearing and, although he was not as polished a witness as attorney Close, his testimony was clear, direct, consistent and unequivocal—and remained unshaken on cross.

In evaluating the relative credibility of Taylor and Remine, we also cannot avoid considering the circumstances under which this interrogation took place. For reasons not disclosed on the record, the two detectives executed the search and arrest warrants just before midnight, rather than at a more appropriate hour. The crime in question had occurred many weeks earlier, so the officers were hardly in hot pursuit. And there is no indication that Taylor was aware he was under suspicion and would attempt to flee the jurisdiction. To the contrary, he was found in his home, sleeping.

The detectives knew Taylor was sixteen. Yet, having arrested Taylor in the middle of the night, and having found him in his home without a parent present, they chose to conduct the interrogation immediately and to carry it on until they got a confession. There is no evidence that the detectives attempted to locate Taylor's mother, nor any suggestion as to the existence of an exigency that required that Taylor be arrested and interrogated at a time when his defenses and ability to think straight were weakened by the lateness of the hour, the absence of a parent and the inherent intimidation of the circumstances. Commencing the interrogation of a teenager after midnight, and pressing it past 3:00 a.m., absent some showing that delay would risk the destruction of evidence or other such harm, creates far too great a risk that a false confession will be extracted, leading to the unjust conviction of an innocent person. *See Haley,* 332 U.S. at 599, 68 S.Ct. 302 (An adolescent "cannot be judged by the more exacting standards of maturity. That which would leave, a man cold and unimpressed can overawe and overwhelm a lad in his early teens. ... A 15–year–old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition."). Moreover, the very fact that the detectives chose to conduct their interrogation of Taylor in such circumstances, rather than waiting until he had an opportunity to rest and contact his mother, lends plausibility to Taylor's claim that the detectives en-

---

**16.** Section 2254(e)(1) provides that petitioner must rebut the presumption of correctness with clear and convincing evidence. Where, as here, the presumption does not attach, it may be more appropriate to require petitioner to prove his factual contentions by a preponderance of the evidence. *Cf. Silva v.* *Woodford,* 279 F.3d 825, 835 (9th Cir.2002) (petitioner bears burden of proving he merits habeas relief by the preponderance of the evidence). For present purposes, however, we evaluate his factual claims under the stringent clear-and-convincing standard normally required of habeas petitioners.

gaged in hard-ball tactics to get him to confess before he had a chance to seek the advice of an adult as to how he should proceed. By their unjustified and distasteful actions, Detectives MacLyman and Remine lent credence to Taylor's account of what happened during the three hours that he was trapped by them in the interrogation room.[17]

We find clear and convincing evidence in the record that Taylor, during questioning, asked to speak with a lawyer and with his mother more than once before inculpating himself; that these requests went unheeded; that MacLyman brandished his ring in Taylor's face; and that MacLyman threateningly mapped the potential consequences for Taylor if he did not confess, in a disingenuous effort to persuade Taylor that persisting in his denials would cost him dearly, and the only way to avoid a life sentence would be for him to fess up.

■ Because neither the state trial court nor the court of appeal discussed Close's testimony in ruling Taylor's confession admissible, they made no finding as to whether Taylor invoked his right to counsel *prior* to the start of questioning. It is well-established that when the state courts do not make findings at all, no presumption of correctness attaches, and we must make our own findings. *See Wiggins*, 123 S.Ct. at 2540. We therefore find that Taylor also requested counsel prior to the start of questioning. Taylor testified that

he took an elevator to the floor where the interrogation room was located. Close testified that Taylor said he had requested to speak with Close on the elevator in the police station prior to questioning. While the degree of correspondence between Close's testimony and Taylor's is not as exact here as in other instances, the corroboration of the elevator detail—in the context of other points of corroboration—is sufficient proof that Taylor invoked counsel at that time. Indeed, since the officer who transported Taylor to the interrogation room and to whom Taylor's request was directed, did not testify, Taylor's account on this point is wholly uncontradicted.[18]

■ **6.** In light of our findings, it follows that the court of appeal's conclusion that Taylor's confession was obtained in a constitutionally acceptable manner, and thus was admissible at trial, was an objectively unreasonable application of Supreme Court precedent.

Because Taylor asked to speak with counsel prior to the start of questioning, the detectives should never have started their custodial interrogation at all. That Taylor's request in the elevator was made to another officer, apparently Detective Dugan, makes no difference. Detective Dugan, or whoever escorted Taylor up the elevator, was required to advise other officers that the suspect had invoked his right to counsel and thus could not be ques-

---

**17.** We note in passing that police misconduct is not unknown in the Long Beach Police Department. We recently affirmed the grant of habeas relief to petitioner Thomas Goldstein, who was convicted in 1980 of first-degree murder. *See* Judgment & Order, No. CV 98–5035–DT (C.D.Cal. Dec. 27, 2002), *aff'd* 82 Fed. Appx. 592 (9th Cir.2003). Habeas relief was granted because the prosecution failed to disclose to Goldstein that Long Beach officers had struck a deal with an informant, who provided critical testimony against Goldstein at trial; that they were im-

permissibly suggestive in handling the photographic identification of Goldstein by the only eyewitness to the murder; and that they advised the eyewitness not to retake the stand after he had misgivings about his recognition of Goldstein. Among the officers investigating Goldstein for the murder was Detective William MacLyman. R.T., *People v. Goldstein*, Case No. A020746 (L.A.Cty.Super.Ct.), at 603–04.

**18.** *See also* note 15 *supra*.

tioned until he had talked to a lawyer. *Cf. Arizona v. Roberson,* 486 U.S. 675, 687–88, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Subsequently, during questioning, the detectives should have immediately ceased custodial interrogation upon hearing Taylor's repeated requests that he be allowed to call a lawyer while he was in the interview room. *See Miranda,* 384 U.S. at 444–45, 86 S.Ct. 1602. They did not. Taylor's inculpatory statements were therefore taken in violation of *Miranda,* and their admission during the prosecution's case-in-chief violated Taylor's clearly-established rights under the Fifth and Fourteenth Amendments. *See Edwards,* 451 U.S. at 486–87, 101 S.Ct. 1880. That the detectives may have administered *Miranda* warnings to Taylor at the start of questioning [19] and again on the tape-recording is of no consequence.[20] As the Supreme Court explained in *Edwards,*

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation *even if he has been advised of his rights.* ...
>
> [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–85, 101 S.Ct. 1880 (emphasis added) (footnote omitted); *see also Roberson,* 486 U.S. at 680–81, 108 S.Ct. 2093.

Taylor's confession was also inadmissible because it was not voluntarily given. Whether a confession is voluntary is determined under the totality of the circumstances, which include "the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health." *Withrow v. Williams,* 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (citations omitted). Sixteen-year-old Taylor was interrogated for roughly three hours in the middle of the night, without an attorney or parent. The record indicates that he had been arrested in the past but that he had never even been charged with an offense or put on informal probation. While Taylor's prior encounters with law enforcement and the advisement of his *Miranda* rights favor the state's position that he confessed voluntarily, *cf. Fare v. Michael C.,* 442 U.S. 707, 726–27, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), Taylor's relative youth, the time of night when he was questioned, the length of the interrogation, the absence of an attorney or parent, the fact that he "was given no food, offered no rest break, and may or may not have been given any water," Ct.App. Opin. at 6, and the denial of his requests to speak with his mother suggest otherwise, *see Haley,* 332 U.S. at 600, 332 U.S. 596. That MacLy-

---

**19.** In light of our following discussion, we need not address Taylor's argument that his waiver, at least at the start of questioning, was not voluntary, knowing and intelligent.

**20.** Although we analyze the second administration of rights as distinct from the first, we doubt that the second could be construed as a separate advisement. The record indicates that there were no significant breaks in the chain of events leading to Taylor's initial inculpatory statement and the tape-recording of

the confession. The recorded waiver was couched entirely in the past tense and only memorialized the first. *See, e.g.,* R.T. of Exh. 9 (confession) at 1 ("I showed you a form and read you a form that's called an advisement of legal rights form; is that correct?"). *Cf. Collazo v. Estelle,* 940 F.2d 411, 421–23 (9th Cir.1991) (en banc) (advisement conducted in past tense and referencing previous advisement effectively continued an earlier session of questioning that had terminated three hours before).

man threatened Taylor by jabbing his ring in Taylor's face and diagramming a grim future if Taylor did not confess, convinces us that the boy's will was overborne. *Cf. Collazo v. Estelle*, 940 F.2d 411, 427 (9th Cir.1991) (en banc) (Kozinski, J., concurring) ("We cannot allow police to advise suspects that they will pay dearly for taking advantage of their right to counsel. . . ."). That Taylor was denied access to a telephone in order to contact his lawyer merely confirms what we readily find based on the other evidence: These detectives were simply not going to play by the rules. We find that the detectives' coercive and constitutionally unacceptable misconduct overbore Taylor's free will, rendering his confession involuntary.

■ **7.** Admission of Taylor's confession was trial error rather than structural error. *See Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Ghent v. Woodford*, 279 F.3d 1121, 1126 (9th Cir.2002). Because the court of appeal found the confession admissible, it did not conduct harmless-error analysis. We must therefore review the evidence at trial to determine whether the confession likely had a substantial and injurious impact on the verdict; if not, its admission was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637–39, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000).

Shadden was riding his bicycle near the beach when two young males, one taller, the other shorter, grabbed his bicycle and tried to take it from him. Shadden resisted and gave chase on foot, pursuing the taller boy. The latter apparently shot Shadden while running away from him, fatally hitting him twice from a distance of at least two feet.

The main issue at Taylor's trial was identity, as the prosecution sought to prove that Taylor was the taller boy who had shot Shadden. Of two witnesses to the crime and its immediate aftermath, only one, Gerald Ofhgang, had seen the taller boy, and his best look was from twenty-five feet away while driving at night. Ofhgang had initially identified both boys as Hispanic. Ofhgang did identify the shorter boy from a photograph as an individual named Victor Rodriguez, but he couldn't identify Taylor as the taller boy. And, as the record reflects, Taylor is not Hispanic.

Another state witness, Ana Bonilla, said she, her boyfriend and other teenage boys—some of them Hispanic—had been driving around the beach area in a van on the night of the killing. She testified that she had seen Taylor in possession of a gun on a prior occasion but did not specify how long before Shadden's killing. In addition, Bonilla testified that Taylor and Victor Rodriguez entered the van in the vicinity of the crime scene, after which she heard someone say that a person either had been or would be killed; she also heard someone say something about urinating on his hands. She could not attribute these vague murmurings to a specific individual in the van.

Detective Remine then testified and contradicted Bonilla. Bonilla had apparently approached the police in response to a reward program publicizing the crime and, according to Remine, told the police on that previous occasion that it was Taylor who had spoken and that it was Taylor who said he had killed someone and asked a friend to urinate on his hands.[21] Remine testified that Bonilla had hesitated before identifying Taylor as the speaker.

---

**21.** Remine explained in his trial testimony that the urine would have rendered ineffective any test for gunpowder residue.

Of all of this testimonial evidence, only Bonilla's hearsay statements, as related by Remine, linked Taylor to Shadden's killing, and Bonilla contradicted those statements in her trial testimony. But Bonilla's testimony did place Taylor near the area where Shadden was killed on the night he was killed, and confirmed that Taylor had a gun at some point in the past, though not necessarily on the night of the killing. Other than Bonilla's hearsay and testimony, however, the state presented nothing to prove that Taylor killed Shadden. The gun used to shoot Shadden was never found, and the prosecution presented no fingerprints, footprints or other physical evidence linking Taylor to the crime.

Defense counsel was permitted to argue to the jury that the confession was false and that the circumstances of his questioning had intimidated Taylor into giving it. But the jury did not hear Close's testimony about Taylor's phone call to him because that testimony was excluded by the trial court, a ruling upheld by the court of appeal. *See* pages 1005–1006 *supra*. The jury was thus left in the dark about the fact that Taylor had recanted his confession shortly after he made it, that he was in tears and agitated and that his story at trial closely matched the account of the interrogation he had given to Close at the time. Defense counsel also called a clinical psychologist to the stand, who testified that Taylor has verbal skills and a total IQ near the low end of the average range.

■ In determining whether error was harmless, we do "not examine whether there was sufficient evidence to support the conviction in the absence of the constitutional error." *Ghent*, 279 F.3d at 1127. Rather, we determine "whether the error had a 'substantial and injurious effect or influence'" on the jury verdict. *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Here, it surely did. There was

no physical evidence linking Taylor to the crime and no eyewitness to the incident that could identify him as the assailant, and Bonilla's trial testimony contradicted her hearsay statements. The only solid evidence against Taylor was the eleven-minute taped confession that was extracted from him in the wee hours of September 2, 1993. Moreover, we are mindful of the Supreme Court's admonition as to the devastating power of confessions:

> A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Bruton v. United States*, 391 U.S., at 139–40, 88 S.Ct., at 1630 (White, J., dissenting). See also *Cruz v. New York*, 481 U.S., at 195, 107 S.Ct., at 1720 (White, J., dissenting) (citing *Bruton*).... [A] full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision.

*Fulminante*, 499 U.S. at 296, 111 S.Ct. 1246 (first two alterations in original).

Given the paper-thin evidence implicating Taylor, we have no choice but to conclude that the eleven-minute recording played to the jury likely had a substantial and injurious impact on its verdict. Admission of the confession was not harmless.

\* \* \* \* \* \*

The magistrate's report and recommendation adopted by the district court concluded that Taylor did not rebut the

presumption of correctness and did not demonstrate that the state courts' determinations were objectively unreasonable. Based on our independent review of the record, we conclude the district court erred. Taylor is entitled to habeas relief. We therefore REVERSE the decision of the district court and REMAND with instructions to GRANT a conditional writ of habeas corpus, ordering Taylor's release unless the state of California notifies the district court within thirty days of the issuance of this court's mandate that it intends to retry Taylor based on evidence other than the illegally-obtained confession, and actually commences Taylor's retrial within seventy days of issuance of the mandate.

## APPENDIX

### DIRECT EXAMINATION

BY MR. SCHMOCKER [defense counsel]:

Q: Sir, how are you employed?

A: An attorney, self-employed.

Q: And are you licensed to practice in the state of California?

A: Yes, I am.

Q: Directing your attention back to the early morning hours of September second, 1993, did you receive a phone call?

A: Yes, I did.

Q: About what time did you receive a phone call?

A: Approximately four a.m.

Q: And who did you receive a phone call from?

A: Leif Taylor.

Q: And do you recognize Mr. Taylor in the court-room today?

A: He is present at counsel table, sitting at the end of counsel table, in a white, short sleeve shirt.

MR. SCHMOCKER: May the record indicate—

THE COURT: Yes, that's the defendant, Mr. Taylor.

MR. SCHMOCKER: Thank you.

Q BY MR. SCHMOCKER: Had you known Mr. Taylor prior to September second, 1993?

A: For approximately a year or so prior to that.

Q: And how did you know him?

MR. LAMB [prosecution]: Objection, your honor, none of this is relevant.

THE COURT: I will allow that question.

THE WITNESS: I known [sic] him from clean up of the community, and graffiti clean up, as well as the probation department and a gang baseball team and doing chores in the neighborhood for me and for other people in the neighborhood.

Q: Had you ever provided your card to Mr. Taylor?

A: Yes, I had.

Q: And had you, in a personal discussion with him, offered your services if he ever needed them?

A: Yes.

Q: And on your card, does it, does your card contain not only your business number but other telephone numbers in order to reach you?

A: It has my home number, and a fax number.

Q: And when you were contacted at around four o'clock in the morning on September second, upon which phone line were you contacted?

A: On my home line.

Q: When you received that conversation, that telephone call, had—did you hear, did you actually hear Leif Taylor's voice?

A: Yes, I did.

Q: And how long did that conversation last?

A: Probably five minutes.

Q: During the course of that conversation, let me ask you this.

You had spoken with Mr. Taylor previous to that occasion?

A: Many times, yes.

Q: And can you, from the tone of his voice, could you—can you tell us anything, could you tell us about the tone of his voice, then, on September second, 1993?

A: He was in tears and highly agitated.

Q: And when you received the phone call, what is the first thing that Mr. Taylor told you?

A: He told me that he had just confessed to the police that he had committed a murder.

Q: And did you respond to that?

A: Well, when he told me that, it was a continuous dialogue on his part. He told me that he had confessed because he had asked to talk to an attorney, and talk to his mother, and that he had been interrogated for some four hours, and the only reason he confessed was so he could make the phone call.

THE COURT: Just a minute. Is this all right, that your attorney gives all this testimony, because it would otherwise be confidential; is that okay with you?

THE DEFENDANT: Yes, that's okay with me.

MR. SCHMOCKER: It is, your honor.

THE COURT: Thank you.

Q BY MR. SCHMOCKER: And when he finished, so he told you that the reason that he confessed; is that correct?

A: Yes.

Q: Did he tell you anything else about that confession?

A: He said that during the confession, one of the officers kept pushing a diamond ring with the numbers 187 in his face, and drew a diagram of two different routes of what would happen to him. One route if he cooperated and confessed, the other route that if he refused to do so, and what the consequences would be.

Q: And what were the consequences, if he confessed?

A: I don't know. He wouldn't tell me. Just that a map was drawn in front of him, giving two possible alternatives, to whether or not he cooperated and confessed.

Q: And did he tell you when it is that he requested a lawyer?

A: He said he requested, by name, to speak to me on the elevator in the police department, prior to the questioning.

Q: And did he say whether or not he repeated that request during the interrogation?

A: He said at least four times, he asked to have his lawyer present, and he also asked to have his mother present.

Q: And during the course of this conversation, did he ask you for your advice?

A: I told him to say nothing. That the court would appoint an attorney to represent him. To tell the police officers, if they question him any further, that he wanted to have a court-appointed lawyer on his behalf, and that I would not be able to represent him because I would probably be a witness.

MR. SCHMOCKER: Your honor, may I have just one moment?

Q BY MR. SCHMOCKER: Did he tell you how he felt before he made this statement to the police?

A: No.

MR. SCHMOCKER: Nothing further.

THE COURT: Mr. Lamb.

*CROSS EXAMINATION*

BY MR. LAMB: Thank you, your honor.

Q: Mr. Close, I am not quite clear, did he tell you "I lied to the police and confessed to them," or did he tell you "I confessed?"

A: No, he adamantly insisted he didn't do it, but the only reason he confessed was because he was desirous of making a phone call to his lawyer and his mother. He said that was the reason for the confession.

MR. LAMB: No further questions, your honor.

THE COURT: Anything, Mr. Schmocker?

MR. SCHMOCKER: No, your honor. Nothing further.

THE COURT: Sir, thank you for coming in from Whittier. You are free to go.

R.T. at 58–63.